1  David R. Markham (State Bar No. 071814)
   R. Craig Clark (State Bar No. 129219)
2  **CLARK & MARKHAM LLP**
   600 "B" Street, Suite 2130
3  San Diego, CA 92101
   Telephone: (619) 239-1321
4

5  Stuart C. Talley (State Bar No. 180374)
   **KERSHAW, CUTTER & RATINOFF, LLP**
6  401 Watt Avenue
   Sacramento, California 95864
7  Telephone: (916) 448-9800
   Facsimile: (916) 669-4499
8

9  Barron E. Ramos (State Bar No. 179620)
   **LAW OFFICES OF BARRON E. RAMOS**
   Attorney at Law, A Professional Corporation
10 132 N. El Camino Real, # 303
   Encinitas, CA 92024
11 Telephone: (858) 461-0500          ***DOCUMENT SUBMITTED UNDER SEAL***

12 [Additional Counsel Listed on Signature Page]
   Attorneys for Plaintiffs and the Class
13

14                    UNITED STATES DISTRICT COURT

15                   NORTHERN DISTRICT OF CALIFORNIA

16 HAIDEE ESTRELLA, an individual,          Case No.: 09-03156 SI
   and ANGELICA ARITA, an individual, on
17 behalf of themselves and all others similarly    **REDACTED**
   situated, and on behalf of the general public,
18
                                                    **PLAINTIFFS' MEMORANDUM OF**
19              Plaintiffs,                          **LAW IN SUPPORT OF MOTION**
                                                    **FOR CLASS CERTIFICATION**
20        v.
                                                    Date:  April 9, 2010
21 FREEDOM FINANCIAL NETWORK,                       Time: 9:00 a.m.
   LLC, a Delaware limited liability company;
22 FREEDOM DEBT RELIEF, INC., a
   California corporation; FREEDOM DEBT            Courtroom No. 10
23 RELIEF, LLC, a Delaware limited liability       Judge: Honorable Susan Illston
   company; GLOBAL CLIENT SOLUTIONS,
24 LLC; ROCKY MOUNTAIN BANK AND
   TRUST; ANDREW HOUSSER; and
25 BRADFORD STROH and DOES 1 through
   100,
26
27              Defendants.
28

# **TABLE OF CONTENTS**

Page(s)

I.      INTRODUCTION ................................................................................................ 1

II.     FACTUAL BACKGROUND ............................................................................. 3

        A.      The Initial Contact...................................................................................... 4

        B.      FDR Sets Up a "Special Purpose Account" at Rocky Mountain Bank ................. 5

        C.      The Consumer Starts Paying Fees.............................................................. 7

        D.      Settlement of Debts.................................................................................... 8

        E.      FDR's Discontinuance Penalty .................................................................. 8

        F.      The Consequences of the Defendants' Program ....................................... 9

III.    THE PLAINTIFFS' CLAIMS .......................................................................... 10

        A.      The Defendant's Business Practices are Unlawful Because They Are
                Operating as Proraters Without a License and Charging Fees In Excess of
                The Amount Permitted by California Law................................................. 11

        B.      The Defendant's Advertising is False and Misleading .......................... 13

        C.      The Defendant's Debt Settlement Program Is Illegal Since It Violates
                California's Prohibition Against Intentionally Interfering With
                Contractual Relations.............................................................................. 15

        D.      The Defendants' Agreements Impose Illegal Penalties ......................... 15

        E.      Rocky Mountain Bank and Global Actively Aided and Abetted FDR and/or
                Acted as Their Agents and/or Joint Venturers ....................................... 16

        F.      Defendants' Business Practices Violate the Credit Repair Organization Act....... 17

IV.     THE CLASS MEETS ALL THE REQUISITES FOR CERTIFICATION
        UNDER FRCP RULE 23................................................................................. 18

V.      CONCLUSION ................................................................................................ 24

-i-

# TABLE OF AUTHORITIES

## STATE CASES

Page(s)

*American Philatelic Society v. Claibourne*
(1935) 3 Cal.2d 689 ............................................................................................... 16

*Freedman v. Rector, Wardens & Vestrymen of St. Mathias Parish*
(1951) 37 Cal.2d 16 ............................................................................................... 15

*Fiol v. Doellstedt*
(1996) 50 Cal.App.4th 1318 .................................................................................. 16

*Nationwide Asset Services, Inc. v. DuFauchard*
(2008) 164 Cal.App.4th 1121 .......................................................................... 12,16

*People v. Bestline Products, Inc.*
(1976) 61 Cal.App.3d 879...................................................................................... 16

*Quelimane Co. v. Stewart Title Guaranty Co.*
(1998) 19 Cal.4th 26 ............................................................................................. 15

*Wyatt v. Union Mortgage*
(1979) 24 Cal.3d 773 ............................................................................................ 16

## FEDERAL CASES

*Amchem Products, Inc. v. Windsor*
(1997) 521 US 591, 614......................................................................................... 22

*Ansari v. New York Univ.*
(S.D.N.Y. 1998) 179 F.R.D. 112 ........................................................................... 19

*Blackie v. Barrack*
(9th Cir. 1975) 524 F.2d 891.................................................................................. 18

*Brothers v. First Leasing*
(9th Cir.1984) 724 F.2d 789................................................................................... 17

*Consolidated Rail Corp. v. Town of Hyde Park*
(2nd Cir. 1995) 47 F.3D 473 ............................................................................ 18,19

*Cortese v. Edge Solutions, Inc.*
2007 WL 2782750, 4 ............................................................................................. 17

*General Tel. Co. of Southwest v. Falcon*
(1982) 457 US 147, 157......................................................................................... 21

*Hanlon v. Chrysler Corp.*
(9th Cir. 1998) 150 F.3d 1011............................................................................ 19,20

*Helms v. Consumerinfo.com, Inc.*
(N.D.Ala.,2005) 436 F.Supp.2d 1220 ................................................................... 18

-ii-

1

## TABLE OF AUTHORITIES, Cont.

Page(s)

*In re American Medical Systems, Inc.*
  (6th Cir. 1996)75 F.3d 1069 ................................................................................................ 20

*J. I. Case v. Borak*
  (1964) 377 U.S. 426, 84 S. Ct. 1555, 12 L. Ed. 2d 423 ................................................ 22,23

*Katz v. Carte Blanche Corp.*
  53 F.R.D. 539 ................................................................................................................... 23

*Rosario v. Livaditis*
  (7th Cir. 1992) 963 F.2d 1013, 1017-1018 ....................................................................... 20

*Windham v. American Brands, Inc.*
  (4th Cir. 1977) 565 F.2d 59 ................................................................................................ 24

## STATUTES

Business & Professions Code
  Section 17200, et seq. ................................................................................................. *passim*

California Civil Code
  Section 1671 ....................................................................................................................... 15
  Section 3528 ....................................................................................................................... 13

California Financial Code
  Section 12000, et seq. .......................................................................................................... 2
  Section 12002.1 ................................................................................................................... 11
  Section 12200 ................................................................................................................. 11,19
  Section 12314 ............................................................................................................... *passim*
  Section 12314.1 ........................................................................................................... 11,12,20
  Section 12316 ..................................................................................................................... 11

Credit Repair Organizations Act (CROA) 15 U.S.C.
  Section 1679, et. seq. ................................................................................................... *passim*

Federal Rules of Civil Procedure
  Rule 23 ......................................................................................................................... *passim*

## MISCELLANEOUS

*Notes of Advisory Committee on 1966 Amendments* ................................................... 22,23

## I.    INTRODUCTION

This is a nationwide class action brought by a class of debtor customers of defendants Debt Resolution Partners, LLC, Freedom Debt Relief, Inc. and Freedom Debt Relief, LLC, aka Freedom Debt Relief (hereinafter collectively "FDR"), Andrew Housser and Bradford Stroh (the principals of FDR), and Global Client Solutions, LLC and Rocky Mountain Bank and Trust (co-conspirators with FDR).  Plaintiffs seek certification of the following class of consumers:

> **ALL CONSUMERS NATIONWIDE WHO PAID DEFENDANTS FOR DEBT REDUCTION SERVICES DURING THE FOUR YEARS PRECEDING THE FILING OF THE COMPLAINT.[1]**

FDR and its co-conspirators are in the business of providing debt reduction services to consumers.  As set forth on FDR's website, www.freedomdebtrelief.com, FDR targets consumers "struggling with large debt burdens and who need debt relief" and "uses debt negotiation with a goal of dramatically lowering [the consumer's] debt levels."  (Declaration of Stuart C. Talley in Support of Plaintiffs' Motion for Class Certification filed herewith ("Talley Decl."), Exhibit 9 at FFN 007465.)[2]  To provide this service, FDR enters into agreements with consumers whereby consumers agree to set up a bank account, managed by Global Client Solutions (Global), with Rocky Mountain Bank and Trust (Rocky Mountain Bank).  Monies are then withdrawn automatically and transferred on a monthly basis directly from the consumer's own personal bank account into the Rocky Mountain Bank account and used first to pay FDR and its co-conspirators various fees and expenses, and then, should anything remain in the account, to pay creditors that are willing to take less than the full amount owed by the consumer.

Debt reduction services are regulated under the Check Sellers, Bill Payers, and Prorater's

---

[1]  Excluded from the Class are all defendants and all agents, attorneys, and employees of defendants; all members of the California judiciary sitting in judgment of this case; and, plaintiffs' attorneys and their employees; and, all other persons within three degrees of consanguinity of the named defendants, attorneys, employees and judges. Consumers in the State of Washington are also excluded from the class since there is a statewide class action already pending in that state.

[2]  Unless otherwise stated, all references to Exhibits pertain to the Exhibits attached to the Declaration of Stuart C. Talley in Support of Plaintiffs' Motion for Class Certification filed herewith.

-1-

1   Law found in sections 12000 et seq. of the California Financial Code (the "Prorater's Law"). The

2   defendants have violated numerous provisions of the Prorater's Law by, among other things,

3   attempting to collect fees in excess of the maximum fees that are permitted under California

4   Financial Code Section 12314 and by operating without a valid license issued by the Department

5   of Corporations.[3]   These violations are unlawful business practices within the meaning of

6   Business & Professions Code sections 17200 et seq., California's unfair competition law

7   (hereinafter the "UCL").

8       Defendants have also violated the Credit Repair Organizations Act (CROA) 15 U.S.C.

9   sections 1679, et. seq. by collecting fees in advance of providing services. FDR acts as a credit

10   repair organization when it requests that credit bureaus report the consumer's accounts as 'settled

11   in full,' 'settled,' 'paid,' or 'settled for less than the full amount,' even if the creditor has received

12   less than full payment and would otherwise report a "charge off" of the remaining balance due or

13   continue to show a sum owing. (Exhibit 8 at FFN 007452.)

14       This case is ideal for nationwide certification under FRCP Rule 23. FDR's form adhesion

15   contracts state that "[t]his Agreement is governed by the laws of the State of California, without

16   regard to the conflict of law rules of th[e] state [in which the client resides]." (Exhibits 1-6.)

17   Thus, regardless of where class members are situated, the claims of all class members are

18   governed by the laws of the State of California, except for the claim made under the CROA,

19   which is governed by that statute.

20       The class enjoys common issues of fact and law in that all class members were charged up

21   front fees for debt settlement services in violation of California law, in an amount in excess of

22   that permitted by California law, by defendants who were not licensed to conduct such services.

23   Moreover, class members were likely to be deceived by defendants' marketing representations

24   because defendants did not disclose that they were not licensed to act as a bill payer or prorater

25   and did not disclose that they were not lawfully permitted to charge retainer fees and service fees

26   for such services.   Nor did the defendants divulge their very limited success in actually

27   _____

28   [3] The scheme is more fully explained in the May 29, 2008 State of California Desist and Refrain Order issued against FDR, Housser, Stroh and other related entities. Exhibit A to the Second Amended Complaint.

"eliminating debt" for consumers.  The class also enjoys common issues of fact and law in that fees were collected before credit repair services were provided in violation of the CROA.

The two representative plaintiffs' claims are typical of the class in that each of the plaintiffs viewed defendants' misleading marketing representations, then paid monies to defendants where such monies were unlawfully charged and collected, and each have not received a refund of those unlawfully charged and collected monies.  (See Declarations of Haidee Estrella ("Estrella Decl.") and Angelica Arita ("Arita Decl.") filed herewith.)  Moreover, each of the plaintiffs relied upon defendants' false marketing representations when deciding to sign up for the defendants' debt negotiation service, and each representative lost money or property as a result of defendants' unlawful and deceptive business practices.  (*Id.*)  Thus, each representative meets the standing requirements to maintain an action under the UCL.

The class representatives are adequate because neither has a conflict with the class and each is committed to vigorously prosecuting this action.  Likewise, class counsel is adequate having successfully represented millions of consumers in numerous consumer class actions nationwide and is committed to tenaciously and vigorously representing the interests of the class in this action.

Finally, adjudication of the claims on a classwide basis is superior to individual actions in that liability can be adjudicated once for all class members and since the aggregation of relatively small claims is necessary to ensure the vindication of class members' rights.  The question of whether defendants' violated California's Prorater's Law, the UCL, and/or the CROA predominates over all other issues.

For all these reasons and those set forth herein, plaintiffs' motion to certify should be granted.

## II.     FACTUAL BACKGROUND

Through a uniform national advertising campaign, defendants solicit consumers who are deeply in debt and promise that defendants' debt reduction program will help those consumers become "debt free in as little as 12-30 months."  (See Exhibits 7-21.)  The defendants' advertising claims that by enrolling in their program, consumers can minimize creditor calls, cut monthly

-3-

debt payments in half, and that in most instances, debt can be settled for as little as 40 to 60 percent of the amount owed. (*Id.*) Defendants also advertise a "money-back guarantee" in which the consumer does not "pay any service fees unless we save you money!" (*Id.*) FDR's principals also have deceptively established what appears to be an independent and unaffiliated website, "bills.com," which is used, at least in part, to post self-serving blogs designed to promote defendants' debt reduction services to unsuspecting consumers. (Exhibit 43 at 46:10-19.)

Based on these representations, nearly 66,000 thousand consumers throughout the country have enrolled in the defendants' debt settlement program since 2004. (Exhibit 43 at 67:11-68:1.) It is only upon entering the program that consumers discover that, contrary to defendants' representations, (i) the defendants' fees are charged and collected up front - even if defendants don't ever save the consumer a dime by settling a single debt, (ii) that the consumers' debt can nearly double during the program due to late fees and accrued interest charges since consumers' creditors are not paid until all defendants are paid first, (iii) that the consumers' accounts will go into default, destroying their credit rating, and (iv) that there really is no "money-back guarantee" since only those few consumers that fully complete the program are eligible - and then only for a partial refund.

This is how the program works:

### A.     The Initial Contact

Consumers who respond to one of the defendant's advertisements are contacted by an FDR "debt settlement counselor" (a commissioned salesperson) who guides the consumer through a series of predetermined questions concerning the consumer's finances. (Exhibits 22-24; Exhibit 29 at FFN 007534, FFN 007541-45, and FFN 007557-63.) The purpose of this initial "counseling session" is to determine how much the consumer can afford to pay on a monthly basis and to convince the consumer to enroll in the program. (*Id.*) To do this, the counselors are provided with a script and checklist that contains a set of uniform questions that are designed to determine how much the consumer can afford to pay into the program. (*Id.*)

Counselors are also provided with a script they use to describe how the program works. (*Id.*) Counselors advise consumers that if they enter the program they will stop paying their

-4-

1   creditors and will, instead, begin making one monthly payment into a Special Purpose Account

2   ("SPA account") that will be set up at an FDIC insured bank. (*Id.* at FFN 007557.)  Once funds

3   accumulate in the account, after paying FDR its full "retainer" fee and other monthly assessments

4   made by Global and/or Rocky Mountain Bank, FDR will then begin negotiating with creditors.

5   (*Id.*)

6           Counselors are also provided with a list of commonly asked questions that consumers ask

7   about the program and a set of scripted "rebuttals" that the counselor can use to sell the program.

8   (*Id.* at FFN 007557-63.)  These rebuttals repeatedly put forth the message that by entering the

9   program the consumer can reduce their debt by 50 to 60 percent, reduce their "monthly payment"

10  by up to 50 percent, and that they can be debt free in as little as 12 months. (*Id.* at FFN 007534.)

11  Counselors are also told to tell consumers that the program charges no up front fees and that they

12  are the only program in the country with a "money-back guarantee."  (*Id.* at FFN 007558.)

13  ███████████████████████████████████████████████████████

14  ███████████████ (Exhibit 43 at 119-25-120-20.)

15          Once a consumer expresses interest in the program they are then sent a series of

16  documents that they are instructed to fill out and return to FDR.  Included among the documents

17  is a Debt Reduction Agreement (the "Agreement"), a Direct Debit Authorization, and a Limited

18  Power of Attorney. (Exhibit 25.)  Each agreement with FDR used during the class period going

19  back to 2004 stated that the agreement was "governed by the laws of the State of California."

20  (Exhibit 43 at 26:6-7; Exhibits 1-6.)

21          **B.      FDR Sets Up a "Special Purpose Account" at Rocky Mountain Bank**

22          Shortly after the consumer sends back the Agreement and other documents, FDR

23  establishes a "Special Purpose Account" for the consumer at Rocky Mountain Bank.  (Exhibit 29

24  at FFN 007524 and FFN 007447.)  To do this, FDR provides consumers "an application on behalf

25  of the bank and Global Client Solutions."  (Exhibit 43 at 50:11-13; Exhibit 26.)  Global, in turn,

26  has contracted with Rocky Mountain Bank to serve as its "administrative agent" for the purpose

27  of handling all administrative tasks associated with FDR's customers. (Decl. Houser ISO Motion

28  to Transfer, para. 9 (Global is "an agent" of Rocky Mountain); Exhibit 43 at 38:3-4 (Global "acts

-5-

as an agent" of the bank); Exhibit 44 at 10:16-18; Exhibits 36-41.) In essence, Global serves as a middle man and agent between Rocky Mountain Bank and FDR. Approximately 95% of all of FDR's clients were placed with Rocky Mountain Bank during the class period. (Exhibit 43 at 51:5-11.)

After FDR has instructed Global to set up a SPA account for its client, Global then sends the consumer a welcome packet that includes the consumer's account number, an account application, and an account agreement. (Exhibit 26.) The application for the SPA account states that an account has been set up in the client's name at Rocky Mountain Bank, that the account is the consumer's "sole and exclusive property [and] that only [the consumer] may authorize deposits and disbursements from this account." (Exhibit 26 at GCS 00023.) As explained below, these statements are false.

Although on the surface the SPA account appears to be a standard bank account, there are many significant differences that make these accounts unique. First, unlike a typical bank account, Rocky Mountain Bank does not issue checks or debit cards to its SPA account holders. The only way consumers are able access the funds in their account is by contacting Global on the phone or in writing to request a disbursement. (Exhibit 44 at 19:24-20:3.) Second, despite Global's representations that the consumer will have an account at Rocky Mountain Bank in their name, in fact, there is no "account" established at Rocky Mountain Bank for the consumer at all. Rather, Global "aggregates" the funds of all FDR clients and deposits these funds into a single custodial account. (*Id.* at 23:17-20; Exhibit 42.) Hence, Rocky Mountain Bank has no record of the consumer who supposedly has an account at its bank and Rocky Mountain Bank is not able to honor any request by a consumer to withdraw, freeze or otherwise use funds from "their" account. Consumers can only withdraw funds by going through Global. (Exhibit 45 at 36:22-37:6.) Third, despite the fact that the accounts do not accrue interest and have limited accessibility, Rocky Mountain Bank and Global charge a $9 "set up fee," a $7.50 monthly service fee, a $3 fee for each check deposited into the account, and a $20 fee for requesting an overnight withdraw of funds from the account. (Exhibit 26 at GCS 000022.)

## C.    The Consumer Starts Paying Fees

After the consumer signs all the paper work provided by FDR and Global, they are then instructed by FDR to discontinue all contact with creditors, close their accounts, and stop all payments to their creditors. (Exhibits 27 and 28.)  Instead, consumers are told to begin depositing the agreed upon monthly payment into the Rocky Mountain Bank SPA Account.  (*Id.*)  To make these payments, Global electronically withdraws the funds directly from the client's personal checking or savings account pursuant to the Direct Debit Authorizations that the consumer signed during the initial sign up process. (Exhibit 25 at FFN 006568.)

With respect to the payment of FDR's fees, FDR charges a "retainer fee" equal to 5% of the consumers' debt at the time of enrollment, in addition to a "service fee" equal to 10% of the consumers' enrolled debt. (*Id.* at FFN 006564, ¶14.)[4]  To pay this 15% total fee, the Agreement authorizes FDR to automatically withdraw funds electronically from the client's SPA account each month. (*Id.* at FFN 006568.)

FDR utilizes a formula that requires all fees to be paid within the first 19 months of the program. (Exhibit 29 at FFN 007538.)  Pursuant to this formula, the entire "retainer fee" is taken from the SPA account over the first four months and then the service fee is deducted over the next 15 months. (*Id.*)  As a result, most of the funds deposited into the SPA account over the first 19 months are taken by FDR to pay its fees. (*Id.*)

For example, in the case of representative plaintiff Haidee Estrella, she entered the program with $34,489 in debt and agreed to pay a total of $576 each month into her SPA account. (Exhibit 25.)  Under the terms of Ms. Estrella's agreement, during the first four months of the program, 74% of her monthly payments were to be taken by FDR to pay its "retainer fee." (*Id.*)  For the next 15 months, FDR planned to take approximately 40% of the monthly payments for its "service fee." (*Id.*)

/ / /

---

[4] The "retainer fee" changed from 4% to 5% sometime in the late 2004 early 2005 time period and the 10% "service fee" is "as low as it goes," oftentimes exceeding 10%.  (Exhibit 43 at 32:8-33:2.)  Roughly 99% of the class was obligated to pay between 10-12% in "service fees." (*Id.* at 33:21-25) and 90% of the class was obligated to pay 4-5% "retainer fees." (*Id.* at 34:10-21.)

-7-

### D.     Settlement of Debts

Under the terms of the Agreement, FDR does not negotiate the consumer's debts until sufficient funds (after payment of FDR's fees) have accumulated in the SPA account. (*Id*. at FFN 006563, ¶10.) Because such a large percentage of the initial payments are paid to FDR in fees, it takes several months for funds to accumulate in the SPA account before FDR can begin negotiating any settlements with creditors. (Exhibit 24 at FFN 007292.)

FDR has unlimited "real time" access to all of their clients' SPA account information over the Internet.    (Exhibits 38-40.)    In fact, FDR has open access to all customers' account information directly from Global while Rocky Mountain Bank itself does not even keep track of who has money in the master account or the amount attributable to each customer.    When sufficient funds are accumulated in the account, FDR negotiates with creditors, who have now received no payments or contact from the client for several months, and attempts to offer a lump sum settlement of the debt. (Exhibit 29 at FFN 007537.)

Once FDR negotiates a settlement with a creditor, it then electronically instructs Global to pay the debt from the client's account for the negotiated amount. (Exhibit 29 at FFN 007537 and FFN 007561; Exhibit 43 at 61:8-62:14.) This withdrawal of funds from the consumer's SPA account can be accomplished by FDR alone and without any specific or contemporary authorization from the consumer. (*Id*.) The only deviation from this payment process began in July 2008. At that time, FDR began requiring its California clients to provide an express written authorization to Global authorizing the withdrawal of funds from their SPA account. (Exhibit 30; Exhibit 43 at 56:19-62:24; Exhibit 44 at 30:1-34:14.) However, with respect to all of their non-California clients, FDR continues to withdraw funds from the SPA accounts without any type of express authorization from the consumer. (*Id*.)

### E.     FDR's Discontinuation Penalty

Although FDRs advertising repeatedly asserts that it offers a "money back guarantee" and that clients will "not pay any service fees unless we save you money," the fine print of their Agreements tell a much different story. In the Agreement under the heading "Money-Back Guarantee," FDR imposes multiple limitations on its "guarantee" that essentially makes the

-8-

1  guarantee worthless.  (Exhibits 1-6 at para. 4.)

2  First, FDR only agrees to refund service fees, not retainer fees.  (*Id.*)  Second, all refunds

3  of service fees are limited by a complex formula that supposedly guarantees that the client's fees

4  will be no more than 1/3 of the amount that the client's "balances have been reduced."  (*Id.*)  Only

5  later in the Agreement is it explained that the calculation of the "reduced balances" is not based

6  on the debt at the time the client enrolls in the program but, instead, is based on the inflated debt

7  that the client has accumulated after many months of making no payments on their accounts.

8  (*Id.*)

9  Third, the Agreement provides that FDR's "money back guarantee" only applies to

10  consumers who actually complete the program.  (*Id.*)  FDR's person most knowledgeable

11  admitted that as many as 60% of the consumers who enter their program drop out before

12  completion.  (Exhibit 43 at 119:4-10.)  The Agreement expressly provides that consumers who

13  voluntarily withdraw from the program before all debts have settled forfeit all retainer and service

14  fees paid to FDR.  (Exhibits 1-6 at paras. 4 and 15.)  This is true even if FDR has not negotiated a

15  single client debt or performed any services for the client whatsoever.  (*Id.*)

16  **F.  The Consequences of the Defendants' Program**

17  In most cases, enrollment in the defendants' program is devastating to the consumer's

18  financial wellbeing.  As indicated above, FDR's program only works (meaning that FDR is able

19  to negotiate a lower sum payable to creditors) if the consumer ceases all communications with

20  their creditors, stops making their minimum monthly payments, and instead makes payments into

21  their SPA account.  (Exhibit 43 at 86:20-23.)  Since almost all of the initial monthly payments to

22  the SPA account are removed by FDR to pay FDR's fees, it takes several months before any debt

23  negotiations can begin with the smallest creditors and potentially years before negotiations begin

24  with larger creditors.  As a result, consumers entering the program immediately begin

25  accumulating default rate interest charges and penalties.  In other words, instead of reducing the

26  consumer's debt, the debts actually grow.  During this time period, consumers are harassed by

27  creditors, their credit ratings are ruined, and, in many instances (including plaintiff Arita), they

28  are sued.  Consumers are often forced into bankruptcy.

-9-

As a result of the devastating consequences to consumers caused by predatory "debt relief" companies like FDR, various governmental entities have attempted to impose stricter regulations. In fact, in a recent letter written by the National Association of Attorneys General, the attorneys general of 39 states, including California, have requested that the FTC impose stricter regulation on debt settlement companies such as FDR. (See Request for Judicial Notice in Support of Plaintiffs' Motion for Class Certification filed herewith ("RJN") at Exhibit 1.) In its letter to the FTC, the attorneys general reported:

> The actions of debt relief companies have resulted in substantial increases in consumer complaints being filed with States across the country. Further, the severity of the harm complained of by consumers is reflected in the fact that over the past five years, twenty-one states have brought at least 128 enforcement actions against debt relief companies.

(*Id.* at p. 2.)

The primary complaints noted by the Association include debt settlement companies falsely advertising their success rates, failing to disclose their high drop out rates, and charging substantial up front fees that are forfeited when consumers leave the program. (*Id.*)

Similar consumer complaints specifically related to the services of FDR have also been reported by the Better Business Bureau ("BBB"). The Oakland branch of the BBB reports that it has received over 175 complaints from consumers directly related to the services provided by FDR. (See RJN, Exhibit 2.) In fact, the BBB was so concerned about FDR's practices that it agreed to actively participate in an enforcement action brought by the California Department of Corporations against FDR in 2008. (*Id.*)

## III.    THE PLAINTIFFS' CLAIMS

The plaintiffs' complaint contains causes of action for 1) violation of California Business and Professions Code Section 17200; 2) violation of the Credit Repair Organization Act; 3) Violation of the Consumer Legal Remedies Act; and 4) Negligence. The following are the factual bases for these claims.

/ / /

/ / /

-10-

### A. The Defendant's Business Practices are Unlawful Because They Are Operating as Proraters Without a License and Charging Fees In Excess of The Amount Permitted by California Law

One of the primary allegations in plaintiffs' complaint is that the defendants operate as "proraters" under California law and that as a result of their failure to follow various restrictions that California imposes on proraters, their contracts with consumers are null and void. Specifically, California Financial Code § 12002.1 defines a "prorater" as:

> a person who, for compensation, engages in whole or in part in the business of receiving money or evidences thereof for the purpose of distributing the money or evidences thereof among creditors in payment or partial payment of the obligations of the debtor.

California Financial Code § 12200 requires entities operating as "proraters" to obtain a license from the Department of Corporations in order to conduct business within the state. Additionally, California imposes substantial limits on the fees proraters operating within the state can charge for their services and prohibits imposing cancelation fees or penalties on consumers who withdraw from their programs. Cal. Fin. Code sections 12314 and 12314.1. Specifically Section 12314 limits fees to twelve percent "(12%) for the first three thousand dollars ($3,000), eleven percent (11%) for the next two thousand dollars ($2,000), and ten percent (10%) for any of the remaining payments distributed by a prorater to the creditors of a debtor." Additionally, Section 12314(b) provides that a prorater may not charge an origination fee exceeding $50.

The consequences of entering into fee agreements that exceed these fee caps are enumerated in California Financial Code § 12316. Specifically, this code provision provides that with respect to "any prorater who contracts for, receives or makes any charge in excess of the maximum permitted by this division . . . the prorater's contract with the debtor shall be void and the prorater shall return to the debtor ***all charges received from the debtor***." (Emphasis added.)

The plaintiffs allege that FDR is a prorater under California law and is required to be licensed pursuant to California Financial Code § 12200. The plaintiffs further allege that the defendants' failure to obtain such a license results in their Agreements being null and void and requires them to refund all fees paid by the class. Additionally, the plaintiffs allege that even if the defendants' Agreements were not null and void, a refund of all fees would still be required

-11-

1  since their agreements contain fee provisions and forfeiture clauses that violate §§ 12314 and

2  12314.1. Specifically, the fee agreements used by FDR during the class period imposed retainer

3  fees ranging from 4 % to 5 % and service fees ranging from 12% to 15% of the enrolled debt.

4  (See Exhibits 1-6.)

5  A central question presented in this litigation is whether the defendants are, in fact,

6  proraters. There is little doubt that FDR will contend that they have sidestepped California's

7  prorater law by subcontracting out to Global and Rocky Mountain Bank the task of holding the

8  client's funds. However, that very argument has already been expressly rejected in *Nationwide*

9  *Asset Services, Inc. v. DuFauchard* (2008) 164 Cal.App.4th 1121.

10  In *Nationwide*, the court addressed the very issue that is presented in this case and found

11  that a prorater need not have actual physical possession of the debtor's funds to fall within the

12  definition of a prorater under California law. Rather the entity need only have "constructive

13  control" over the funds. In fact, the business model examined by the court in *Nationwide* is

14  virtually *identical* to that used by FDR in this case and involves many of the same parties.

15  In *Nationwide*, Nationwide Asset Services operated an unlicensed debt settlement

16  company within California. Pursuant to the defendant's agreements, customers were directed to

17  transfer monthly payments into dedicated accounts in their names at Rocky Mountain Bank to be

18  administered by Global Client Solutions. As explained by the *Nationwide* court:

19  The customer funds are never in the actual possession of
   [Nationwide]. An independent business entity (Global) manages
20  these dedicated customer accounts under a contract with the
   Colorado bank, withdrawing funds from the accounts in payment of
21  the management fees it assesses on the customers. Upon deposit of
   enrollment fees from the customers, plaintiffs negotiate with the
22  creditors for a settlement on the outstanding debt. At the direction
   of [Nationwide], Global then makes electronic transfers from the
23  customer bank accounts to the creditors for the amount of the
   negotiated settlement. Global also makes electronic transfers from
24  the accounts to plaintiffs in payment of the various fees for their
   services.

25

26  Despite the fact that Nationwide never came into physical possession of its client's funds,

27  the court found that Nationwide still fell within the definition of a prorater. Specifically, the court

28  determined that since Nationwide had access to the funds deposited in Rocky Mountain Bank and

-12-

1   could unilaterally withdraw those funds from the accounts, it had "constructive" possession of the

2   funds.

> If Nationwide indeed [has] managed to 'receive' the money of their customers in all but name, then their conduct is precisely that which the statute has targeted.  There would not be any reason to permit them to evade the statute's salutary requirement of subjecting their practices to defendant's licensing oversight for the protection of consumers. 'the law respects form less than substance.' (Civ. Code, §3528.)   It is no different than deeming an employer-induced resignation to be a 'constructive' discharge in order to prevent the employer from making an end run around discrimination laws.

8   Here, FDR utilizes the same artifice that brought Nationwide within the definition of a

9   prorater.  FDR directs consumers to pay funds into an account at Rocky Mountain Bank that is

10  managed by Global.  FDR sets up the accounts, has access to all the account information,

11  withdraws funds from the account each month to pay its fees, and, when a settlement is reached

12  with a creditor, instructs Global to distribute funds from the account to that creditor.[5]

13  ## B.   The Defendant's Advertising is False and Misleading

14      In addition to asserting that the defendants' business practices are "unlawful" under the

15  UCL, the plaintiffs also independently assert that their advertising violates Section 17200 since it

16  is false and misleading.  Although the defendants advertise through several different mediums, all

17  of the advertising published by the defendants during the class period makes several core claims

18  about their debt reduction services.  Specifically, the defendants' advertising and the scripts used

19  by their sales staff promise consumers that by entering their "program" they can become "debt

20  free in as little as 12-36 months," that they can "lower debts down to as low as 50% of the amount

21  owed," and that there is a "money back guarantee." (See Exhibits 7-21 and 29.)  Each of these

22  claims is likely to mislead the public and is thus a violation of the "deceptive" prong of the UCL.

23      First, defendants' failure to disclose the extremely high attrition rate for consumers

24  entering their program makes all of these claims misleading.  Up to 60% of consumers who enter

25  their program drop out before completion.  (Exhibit 43 at 119:4-10 (just over 40 percent of

26

27  [5] Global has already been subject to a cease and desist order by the Dept. of Corporations from doing business with another debt relief company. (Exhibit 44 at 92:25-93:4.) Global's PMK

28  could not distinguish what is different in its relationship with FDR when compared to the other debt relief company that it was ordered to stop working with. (*Id.* at 93:23-94:2.)

-13-

1   defendants' clients actually complete the program).)  Therefore, the vast majority of clients do not

2   become "debt free in as little as 12-36 months" as a result of entering the defendants' program.

3   Moreover, given the substantial penalties imposed on consumers who leave the program early,

4   this high attrition rate is clearly a material fact that should have been disclosed to all consumers

5   before entering the program.  It is undisputed that none of the advertising published by the

6   defendants during the class period discloses this critical material fact.

7          Second, defendants' claims concerning their average debt reduction rates are highly

8   misleading.  Although defendants' advertisements estimate historical savings rates of 40% to 60%

9   of the "amount owed," these estimates are calculated based on reductions received from the

10  amount owed *at the time the debt is settled* - not the amount owed when the consumer enrolls in

11  the program.  (Exhibit 43 at pp. 125:19-126:12.)  Thus, if a consumer's debt hypothetically

12  doubled during the three years or so that defendants were managing the consumer's accounts, the

13  resulting "settlement" of 40% to 60% of the final amount owed (which would include significant

14  unpaid late fees and accrued interest of up to 30% per annum on many credit cards after default)

15  could be the same or *more* than the consumer originally owed when the consumer signed up with

16  defendants in the first place.  In other words, consumers that complete the program over a three

17  year period could easily end up paying the same or more to their creditors than they originally

18  owed to those creditors, *plus* another 15% to FDR, *plus* monthly fees to Global and Rocky

19  Mountain – all while destroying their credit by paying defendants rather than the their creditors.

20         Moreover, the calculation of their historical "savings rates" fails to include any debts that

21  were not settled because the client either dropped out of the program or the creditor would not

22  negotiate the debt.  (*Id.*)  The historical savings rate was only calculated on debts that were

23  actually settled.  (*Id.*)  Since 60% of consumers drop out of the program before completion and

24  likely have few or none of their debts settled, the exclusion of these individuals from their

25  calculation grossly overstates the defendants' historical "savings rate."  In fact, The Association

26  of States Attorney's General in their comments to the FTC expressly noted how misleading such

27  calculations could be:

28

-14-

> [I]t should also be made clear that any calculation of saving made by a debt settlement company to substantiate its claims to consumers must be made based on the percentage saved of the amounts of the debts consumers sought to have settled at the time they hired the debt settlement company, and not the amounts of their debts at the time they are settled. . . . For example, a consumer entering the program with an unsecured debt of $10,000, which subsequently grows to $15,000 due to late fees, interest, etc. while enrolled in the program, then settles for $8,000, has saved 20% [not 46%]. . . Further, savings calculations must include consumers who do not complete the program, not just those who do.

(RJN at Exhibit 1, p. 12.)

Finally, defendants' promise of a "money back guarantee" is misleading in light of the numerous restrictions found in the fine print of their Agreements. Refunds only apply to "service fees," not retainer fees, and only to consumers who complete the entire program. (Exhibits 1-6 at para. 4.)

### C. The Defendant's Debt Settlement Program Is Illegal Since It Violates California's Prohibition Against Intentionally Interfering With Contractual Relations

Defendant's practice of instructing consumers to ignore their contractual relationships with their creditors constitutes an unlawful business practice prohibited under the UCL. The defendants repeatedly do this throughout their Agreement and in their written instructions to the clients. (Exhibits 1-6 and 27-29.) In fact, the entire premise of their program requires consumers to stop making the minimum monthly payment to creditors and, instead, make payments into their newly established SPA account (from which defendants' fees are deducted). (Exhibit 43 at 86:20-23.) It is well settled that California law prohibits parties from interfering with the contractual relationship of others. *Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26.

### D. The Defendants' Agreements Impose Illegal Penalties

Under California law, any provision in a contract by which money or property would be forfeited without regard to the actual damages suffered is an unenforceable penalty. *See* Cal.Civ.Code § 1671; *Freedman v. Rector, Wardens & Vestrymen of St. Mathias Parish* (1951) 37 Cal.2d 16. Here, defendants' Agreements expressly provide that consumers who fail to make monthly payments into their SPA account or who voluntarily withdraw from the program forfeit

-15-

1  all retainer and service fees that have been paid to FDR. (Exhibits 1-6.) This is true even if FDR

2  provides no services whatsoever. (*Id.*) The inclusion of this unconscionable forfeiture clause

3  constitutes an illegal business practice in violation of the UCL and the Consumer Legal Remedies

4  Act.

5          **E.**    **Rocky Mountain Bank and Global Actively Aided and Abetted FDR and/or**

6              **Acted as Their Agents and/or Joint Venturers**

7      It is well settled that "liability may ... be imposed on one who aids and abets the

8  commission of an intentional tort if the person ... knows the other's conduct constitutes a breach

9  of duty and gives substantial assistance or encouragement to the other to so act." *Fiol v.*

10  *Doellstedt* (1996) 50 Cal.App.4th 1318, 1325. In *American Philatelic Society v. Claibourne*

11  (1935) 3 Cal.2d 689, 696-697, defendant was found liable under the predecessor section to B&P

12  Code section 17200 for manufacturing artificially perforated stamps. While such manufacture

13  was not itself unlawful, the distribution of perforated stamps in the marketplace enables

14  unscrupulous sellers to palm off the counterfeit stamps as genuine. *See also People v. Bestline*

15  *Products, Inc.* (1976) 61 Cal.App.3d 879, 918 (one who "furnishes the means for [the]

16  accomplishment [of a fraud] is liable equally with those who actually make the

17  misrepresentation.").

18      All parties to a conspiracy to violate the UCL are responsible for all of the wrongful acts

19  committed pursuant to the conspiracy, no matter who actually performs the wrongful acts. *Id.* at

20  p. 917-920. Proof of a defendant's joinder in the scheme and knowledge of its unlawful purpose

21  can be shown circumstantially, by examining the nature of the acts and the relationship between

22  the parties. *Wyatt v. Union Mortgage* (1979) 24 Cal.3d 773, 784-785.

23      Here, Rocky Mountain Bank and Global are liable to the class as aiders and abettors. As

24  set forth in detail in Section II(B) above, these entities work together to enable FDR to defraud

25  consumers and to sidestep application of California's prorater law by creating the same scheme

26  that was found to be unlawful in the *Nationwide* case, *supra*.

27      FDR provides consumers "an application on behalf of the bank and Global Client

28  Solutions." (Exhibit 43 at 50:8-13.) However, the only way consumers are able to access the

-16-

1    funds in their "account" is by contacting Global on the phone or in writing to request a

2    disbursement. (Exhibit 44 at 19:24-20:3.) Rocky Mountain has no record of the consumer who

3    supposedly has an account at its bank and Rocky Mountain is not able to honor any request by a

4    consumer to withdraw, freeze or otherwise use funds from their "account." Despite all this, fees

5    are taken from the consumer's "account" for "set up fees," monthly banking service fees, as well

6    as other bank fees. (Exhibit 34 at GCS/RMBT00004.) Thus, Global and Rocky Mountain

7    benefit, just as FDR does, in facilitating the scheme.

8         Additionally, the contractual relationships between Rocky Mountain Bank, Global, and

9    FDR create an agency and/or joint venture relationship whereby each of these entities is fully

10   responsible for the acts and conduct of the others. (See Exhibits 35-42.)

11        **F.    Defendants' Business Practices Violate the Credit Repair Organizations Act**

12        The Credit Repair Originations Act, 15 U.S.C. section 1679, et. seq, prohibits a variety of

13   false and misleading statements, as well as fraud by credit repair organizations (CROs). CROs

14   may not receive payment before any promised service is "fully performed." 15 U.S.C. section

15   1679b. Additionally, CROs are prohibited from making any untrue statements in connection with

16   their business activities to creditors or consumers. *Id*. Consumers can sue to recover the greater

17   of the amount paid or actual damages, punitive damages, costs, and attorney's fees for violations

18   of the CROA.

19        15 U.S.C. section 1679a defines a CRO as

20             (A)    any person who uses any instrumentality of interstate
              commerce or the mails to sell, provide, or perform (or represent that
21            such person can or will sell, provide, or perform) any service, in
              return for the payment of money or other valuable consideration,
22            for the express or implied purpose of--

23            (i) improving any consumer's credit record, credit history, or credit
              rating; or
24
              (ii) providing advice or assistance to any consumer with regard to
25            any activity or service described in clause (i) …

26        In enacting the Consumer Credit Protection Act, of which the CROA is a part, Congress

27   intended for courts to broadly construe its provisions in accordance with its remedial purpose.

28   *Brothers v. First Leasing* (9th Cir.1984)724 F.2d 789, 793; *see also Cortese v. Edge Solutions,*

-17-

*Inc.* 2007 WL 2782750, 4.  To establish a claim under the CROA, a consumer is not required to show that he or she relied on any statement concerning the service, only that such statements were made and that the consumer purchased the service at issue.  *Helms v. Consumerinfo.com, Inc.* (N.D.Ala.,2005) 436 F.Supp.2d 1220, 1236 -1237.

Here, the defendants' advertising and scripts make numerous statements that expressly and impliedly promise that their program will improve their client's credit history.  For example, FDR's website states that after it pays off the client's debt it will "request that [the consumer's] creditors report to the credit rating bureaus that [the consumer's] accounts are 'settled in full,' 'settled,' 'paid,' or 'settled for less than the full amount.'"  (Exhibit 17 at FFN 008137.)  In their scripts, counselors are told to advise prospective clients that ████████████████████████████

████████████████████████████████████  (Exhibit 29 at FFN 007560.)  Additionally, they advise prospective clients that they should ██████████████████████████████

███████████████████████████████  (*Id*. at FFN 007561.)  In one of their advertising flyers the defendants answer the question, what will happen to my credit rating by enrolling in the program as follows:  "Your credit rating is a combination of two factors:  Payment History and Debt Ratio. . . . [O]ur Debt Reduction Program will improve your Debt Ratio to its optimal level in the shortest period of time."  (Exhibit 16; see also Exhibits 31-32.)  All of these statements fall squarely within the definition of a CRO.  Collecting fees before services are "fully performed" violates the Act.

## IV.   THE CLASS MEETS ALL THE REQUISITES FOR CERTIFICATION UNDER FRCP RULE 23.

In evaluating whether plaintiffs have met their burden, the court should accept the substantive allegations of the complaint as true.  *Blackie v. Barrack* (9th Cir. 1975) 524 F.2d 891, 901 n.17.  At the certification hearing, the court looks to the pleadings and may consider extrinsic evidence to determine whether the Rule 23 requirements are met.  *Consolidated Rail Corp. v. Town of Hyde Park* (2nd Cir. 1995) 47 F.3D 473, 484.  To be certified, a class action must satisfy

-18-

the four prerequisites of typicality, commonality, numerosity, and adequacy of representation. See FRCP Rule 23(a).   Following satisfaction of the Rule 23(a) requirements, a plaintiff must additionally satisfy one of the criteria contained in FRCP Rule 23(b) – ordinarily either "superiority" (Rule 23(b)(1)) or "predominance" (Rule 23(b)(3).)

Here, the class meets all the prerequisites of FRCP Rule 23(a), as well as 23(b)(1) *and* 23 (b)(3).

### (i) RULE 23(a)

#### a. The Class Is So Numerous That Individual Adjudication Is Impracticable

In California alone, since 2004, FDR estimates it signed up roughly 11,600 customers. (Exhibit 43 at 67:11-18.) Nationwide, since 2004, the figure is between 65,000 and 66,000. Id. at p. 67-68.   That number is sufficient to meet the numerosity requirement.   *Ansari v. New York Univ.* (S.D.N.Y. 1998) 179 F.R.D. 112, 114 ("…[C]ourts will find that numerosity requirement has been satisfied when the class comprises 40 or more members and will find that it has not been satisfied when the class comprises 21 or fewer."); *see also Consolidated Rail Corp. v. Town of Hyde Park* (2nd Cir. 1995) 47 F.3d 473, 483 (numerosity presumed at 40 members).

#### b. Common Questions of Law Exist Between Plaintiff and the Class.

The Ninth Circuit construes the commonality prerequisite permissibly.   *Hanlon v. Chrysler Corp.* (9th Cir. 1998)150 F.3d 1011, 1019.   So long as class members assert a common complaint and demonstrate they are subject to the same harm, commonality exists.   All questions of law and fact need not be common.   *Id*.   Rather, "[t]he existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Id*.

Here, as set forth in the Second Amended Complaint, the common questions of law and fact in this case include the following:

    (a)   Whether Defendants properly licensed during the class period to act as a bill payer or prorater under California Financial Code section 12200;

    (b)   Whether Defendants charged retainer fees in excess of that permitted by California

-19-

1   Financial Code section 12314;

2   (c)   Whether Defendants charged service fees in excess of that permitted by California

3   Financial Code section 12314;

4   (d)   Whether Defendants charged cancellation fees in violation of California Financial

5   Code section 12314.1;

6   (e)   Whether Defendants violated the CROA by requiring the advance payment of fees;

7   (f)   Whether Defendants violated the CROA by representing that it will "request that

8   [the consumer's] creditors report to the credit rating bureaus that [the consumer's]

9   accounts are 'settled in full,' 'settled,' 'paid,' or 'settled for less than the full

10  amount;'" and

11  (g)   Whether Defendants violated the UCL and the CLRA.

12  All of these are common questions of law and/or fact as to each and every class member.

13  Each common question constitutes a separate violation of the UCL as either an unlawful or

14  deceptive business practice. Global and Rocky Mountain Bank aided and abetted the scheme and

15  are equally liable as well.

16  While the putative class enjoys several common questions of law and fact, there "need be

17  only a single issue common to all members of the class" to meet the commonality requirement.

18  *In re American Medical Systems, Inc.* (6th Cir. 1996)75 F.3d 1069, 1080. A common nucleus of

19  operative facts alone is usually enough to satisfy the commonality requirement of Rule 23(a) (2).

20  *Rosario v. Livaditis* (7th Cir. 1992) 963 F.2d 1013, 1017-1018; see also *Hanlon v. Chrysler* (9th

21  Cir. 1998) 150 F.3d 1011, 1019 (common question requirement can be satisfied either by a shared

22  legal issue with divergent factual predicates or by a common core of salient facts with disparate

23  legal remedies).

24  ### c. Plaintiffs Claims Are "Typical" Of The Class.

25  The claims raised by plaintiffs are typical of the class as a whole. A plaintiff's claim is

26  typical if it arises from the same event or practice or course of conduct that gives rise to the

27  claims of other class members and is based on the same legal theory as the class' claims.

28  *Rosario*, *supra*, 963 F.2d at 1018. The claims of the class representative need not be identical to

-20-

the claims of other class members, but the class representative "must be part of the class and possess the same interest and suffer the same injury as the class members." *General Tel. Co. of Southwest v. Falcon* (1982) 457 US 147, 157.

Here, each of the plaintiffs (Estrella and Arita) responded to the marketing representations of defendants, each signed up for defendants' prorater service, and each paid substantial fees to the defendants which were not fully refunded.[6] (Estrella Decl. at ¶ 3; Arita Decl. at ¶ 3.) Plaintiffs' claims are typical.

### d. Plaintiffs and Their Counsel Provide Adequate Representation

The fourth requirement under Rule 23 (a) is adequacy of representation. The court must find that the plaintiff's counsel is adequate and that the named plaintiffs can fairly and adequately protect the interests of the class. Plaintiffs will fairly and adequately represent the interests of the class. Plaintiff have no conflicts with the class, are determined to see the class's claims vindicated, and have retained class counsel competent in managing consumer claims and a multitude of other complex class actions. (Estrella Decl. at ¶ 2; Arita Decl. at ¶ 2; Declaration of David R. Markham; Declaration of Barron E. Ramos; and Declaration of Talley.)

### (ii) RULE 23(b)

Once a plaintiff has satisfied the Rule 23(a) preliminary requirements of numerosity, commonality, typicality, and adequacy of representation, she must demonstrate that the proposed class action qualifies under one of the sub-sections of Rule 23 (b). In this case, plaintiffs seek certification under Rule 23 (b)(1) *and* Rule 23 (b)(3). Though plaintiffs can satisfy both elements, it is sufficient for certification that they satisfy only *one*.

### a. Class Adjudication Is Superior To All Other Forms.

Under Rule 23 (b)(1), a plaintiff must establish "that class action treatment is the preferable method of handling a case." This is shorthand for the actual rule, which states that Class Actions are appropriate when:

---

[6] In addition, each meets the standing requirements under the UCL as articulated by the California Supreme Court in *Tobacco II*: each relied upon the marketing misrepresentations made by the defendants and each was injured by defendants' conduct. Decl. Estrella at ¶ 3; Decl. Arita at ¶ 3. Neither requirement is necessary for class members.

-21-

(1) the prosecution of separate actions by or against individual members of the class would create a risk of:

    (A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, **or**

    (B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests. Rule 23 (b)(1)(A-B).

The "Superiority" element represents the principal that class adjudication is appropriate when prosecution of individual actions might lead, from case to case, to contradictory results, prejudicing the interests of either the defendant or members of the plaintiffs' class. "To illustrate: separate actions by individuals against a municipality to declare a bond issue invalid or condition or limit it, to prevent or limit the making of a particular appropriation or to compel or invalidate an assessment, might create a risk of inconsistent or varying determinations." See *Notes of Advisory Committee on 1966 Amendments*. Though the facts of liability are no different, different courts adjudicating the matter might reach conflicting conclusions.

Here, the consequences of varying outcomes are significant. For example, one court may conclude that defendants are violating California's prorater statute and/or the CROA whereas another court may conclude they are not. Indeed, if this case is not certified, defendants could easily find themselves subject to conflicting Orders from various courts. This risk alone warrants certification so that the determination can be made once and for all and will bind all of the parties. See *Amchem Products, Inc. v. Windsor*, 521 US 591, 614 (1997) (Rule 23(b)(1)(A) is satisfied "where the party is obligated by law to treat the members of the class alike, or where the party must treat all alike as a matter of practical necessity.").

[I]t must be remembered that the foundation of a class action is that it is "a semi-public remedy administered by the lawyer in private practice." (citations). It is often the only practical effectuation of remedial provisions of legislative policies. The action of Federal agencies entrusted with the enforcement of public policy is limited

-22-

> to compelling compliance with a statute. Private litigation, particularly in the form of a class action, serves to supplement administrative action in furthering the public policy. (*See J. I. Case v. Borak* (1964), 377 U.S. 426, 84 S. Ct. 1555, 12 L. Ed. 2d 423.)

> *Katz v. Carte Blanche Corp.* 53 F.R.D. 539, 543.

There can be no more appropriate use of the Class Action vehicle than in the prosecution of a case involving the violation of important California and federal statutes impacting the rights of tens of thousands of individuals who were subject to the same treatment by defendants.

### b. Issues Common To The Class Predominate Over Individual Issues.

As an alternative to FRCP Rule 23(b)(1), under Rule 23(b)(3), a plaintiff must establish that the questions common to the class predominate over the questions affecting individual members. As noted by the Advisory Committee,

> Subdivision (b)(3) encompasses those cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results. The Court is required to find, as a condition of holding that a class action may be maintained under this subdivision, that the questions common to the class predominate over the questions affecting individual members. It is only where this predominance exists that economies can be achieved by means of the class-action device.

> *See Notes of Advisory Committee on 1966 Amendments*.

Here, the questions whether defendants violated California's prorater statute (an unlawful business practice under the UCL), whether defendants' marketing representations are 'likely to deceive' consumers (a deceptive business practice under of the UCL), and whether defendants violated the CROA (also an unlawful business practice under the UCL) predominate over all other issues.

Also relevant is the fact that (i) there would be no difficulty in maintaining this as a class action because the claims of each class member are relatively simple to adjudicate, (ii) this forum is appropriate since defendants *themselves* chose this District by transferring this case from the Central District, and (iii) class members would likely have little interest in individually controlling the prosecution of separate actions since the amount in controversy for each class member will vary and in some cases will be too small to warrant individual litigation at all.

-23-

1    If defendants are ultimately found liable, this case comes down to nothing more than a

2    mechanical computation of the sums owed to each class member.

3            In cases where the fact of injury and damage breaks down in what
             may be characterized as 'virtually a mechanical task' 'capable of
4            mathematical   or   formula   calculation,'   'the   existence   of
             individualized claims seems to offer no barrier to certification on
5            grounds of manageability.'

6        *Windham v. American Brands, Inc.* (4th Cir. 1977) 565 F.2d 59, 68.

7    **V.    CONCLUSION**

8            The putative class meets the requirements of Rule 23 and is exactly the type of claim ideal

9    for determination on a class-wide basis.  For these reasons, and those set forth herein, plaintiff

10   respectfully requests an Order certifying the class and to set a hearing for determination of how

11   best to disseminate class notice.

12   Dated: January 28, 2010                    **CLARK & MARKHAM LLP**

13

14                                     By: _____*/s/ David R. Markham*_____
                                              David R. Markham
15
                                       CHARLES E. AMES, P.C.
16                                     Charles E. Ames (Pro Hac Vice)
                                       2712 Timberleaf Drive
17                                     Carrollton, TX  75006-2103
                                       Telephone:  (214) 390-8111
18
                                       THE CROSLEY LAW FIRM, P.C.
19                                     Thomas A. Crosley (Pro Hac Vice)
                                       McCombs Plaza, Suite 250
20                                     755 E. Mulberry
                                       San Antonio, TX  78212
21                                     Telephone:  (210) 354-4500

22                                     WEXLER WALLACE LLP
                                       Mark J. Tamblyn
23                                     455 Capitol Mall, Suite 231
                                       Sacramento, California 95814
24                                     Telephone:  (916) 492-1100

25                                     **Attorneys for Plaintiffs and the Class**

26

27

28

                                          -24-