**United States District Court**
For the Northern District of California

1

2

3

4

5          IN THE UNITED STATES DISTRICT COURT

6          FOR THE NORTHERN DISTRICT OF CALIFORNIA

7

8   HAIDEE ESTRELLA, an individual, and           No. C 09-03156 SI
    ANGELICA ARITA, an individual, on behalf of
9   themselves and all others similarly situated   **ORDER GRANTING PLAINTIFFS'**
                                                    **MOTION FOR CLASS**
10              Plaintiffs,                         **CERTIFICATION; DIRECTING**
                                                    **COUNSEL TO PREPARE PLAN FOR**
11      v.                                          **NOTICE TO ABSENT CLASS**
                                                    **MEMBERS; AND SCHEDULING CASE**
12  FREEDOM FINANCIAL NETWORK, LLC;               **MANAGEMENT CONFERENCE FOR**
    FREEDOM DEBT RELIEF, INC.; FREEDOM            **JUNE 25, 2010**
13  DEBT RELIEF, LLC; GLOBAL CLIENT
    SOLUTIONS, LLC; ROCKY MOUNTAIN
14  BANK AND TRUST; ANDREW HOUSSER,
    and BRADFORD STROH
15
                Defendants.
16  _____/

17

18          On April 9, 2010, the Court held a hearing on plaintiffs' motion for class certification.  Having

19  considered the arguments of the parties and the papers submitted, and for good cause shown, the Court

20  hereby GRANTS plaintiffs' motion to certify the class with certain modifications.

21

22                              **BACKGROUND**

23          The subject of this litigation is the legality of a debt reduction program offered by defendants.

24  On December 29, 2008, this lawsuit was initiated in the Orange County Superior Court.  It was removed

25  to the Central District of California based on federal question and supplemental jurisdiction, 28 U.S.C.

26  §§ 1331 & 1367(a), and was, on defendants' motion, transferred to this Court pursuant to 28 U.S.C.

27  § 1404(a) on July 9, 2009.  The operative version of plaintiffs' complaint is the Second Amended

28  Complaint ("SAC"), filed January 6, 2010.  Named plaintiffs Haidee Estrella ("Ms. Estrella") and

United States District Court

For the Northern District of California

1   Angelica Arita ("Ms. Arita") seek redress on behalf of themselves and "all consumers nationwide who

2   paid defendants for debt reduction services during the four years preceding the filing of the complaint."

3   SAC ¶ 47.[1]

4           Plaintiffs describe defendants' conduct as follows.  Defendants Freedom Financial Network,

5   LLC, Freedom Debt Relief, Inc., and Freedom Debt Relief, LLC (collectively "FDR"), along with

6   FDR's Chief Executive Officers Andrew Housser and Bradford Stroh, offer a debt reduction service.

7   FDR's advertisements describe its service as "an innovative solution for consumers struggling with large

8   debt burdens and who need debt relief." SAC ¶ 27.  FDR also advertises to consumers that they can be

9   "debt free in as little as 12-36 months," that FDR can "lower debts down to as low as 50% of what you

10  owe" and that FDR offers a "service fee money back guarantee." *Id.*  Upon enrolling in the program,

11  the consumer signs a contract and authorizes an automatic monthly transfer of funds from the

12  consumer's existing bank account to a new Special Purpose Account ("SPA").  After sufficient funds

13  have accumulated in the client's SPA, FDR contacts the client's creditors and attempts to negotiate a

14  settlement of the client's debt for less than what is owed.  SAC ¶ 10.  Part of the FDR contractual

15  agreement also provides that clients will pay FDR a retainer fee and service fee equal to approximately

16  15% of their existing debt with the breakdown being approximately 10% for the service fee and 5% for

17  the retainer fee.[2]  SAC ¶ 13.  These fees are paid directly from the client's SPA; the retainer fees are

18  deducted over the first four months and the service fees are deducted over the following fifteen months.

19  SAC ¶ 13; FDR Ex. C, D.

20          The evidence shows that approximately 95% of consumers who enrolled in FDR's program

21  opened their SPA with defendant Rocky Mountain Bank and Trust ("RMBT"). Plaints' Ex. 42 ("Staley

22  Depo."), 51:5-53:12.  Defendant Global Client Services ("GCS") acts as an agent for RMBT and is the

23  party that facilitates the release of the clients' funds to both the creditors and to FDR itself.  Mot. Class

---

[1]Plaintiffs' proposed class definition excludes "all defendants and all agents, attorneys, and employees of defendants; all members of the California judiciary sitting in judgment on this case; and, plaintiffs' attorneys and their employees; and, all other persons within three degrees of consanguinity of the named defendants, attorneys, employees and judges."  SAC ¶ 17.

[2]Plaintiffs allege that the standard FDR fee agreement was changed sometime in late 2004 or early 2005, but that roughly 99% of the proposed class were required to pay 10-12% service fee and 90% were obligated to pay 4-5% retainer fees. Mot. for Class Cert., 7 at n.4.

Cert., 5-6.

At the outset of the agreement, the clients sign authorization forms that allow defendants to transfer money from clients' SPAs to pay creditors and FDR. *Id.* 7, 11-13. Prior to 2008, GCS and FDR allegedly did not require express authorization from the client prior to disbursing the client's funds to creditors in settlement of their debt. Beginning in early to mid-2008, however, a new policy was implemented for clients residing in California, such that express authorization was required before the settlement could be paid.

Plaintiffs also allege that FDR represents to its clients that when it settles the client's debt it will "request that [the consumer's] creditors report to the credit rating bureaus that [the consumer's] accounts are 'settled in full,' 'settled,' 'paid,' or 'settled for less than the full amount.'" SAC ¶ 39. Plaintiffs allege that such representations give the consumer the idea that FDR "will attempt to alter the consumer's credit report" as part of its services. *Id.*

Plaintiffs Ms. Arita and Ms. Estrella are residents of California, both of whom contracted with FDR in 2008 for debt reduction services and contractually agreed to pay retainer fees and service fees equal to approximately 15% of their debt as described above. Ms. Estrella canceled her contract with FDR after two months, and though she was offered a partial refund of her money, she refused. Estrella Depo. 43:2-45:15. Ms. Arita cancelled her contract with FDR on August 11, 2009. Houser Decl. ¶ 78. The complaint alleges that Ms. Arita never received any debt relief; however, evidence now shows FDR was able to negotiate a settlement with one of her creditors for an amount equal to almost half of what she owed. SAC ¶ 30; Arita Depo. 58:5-20. Ms. Arita was allegedly offered a full refund of the fees she paid but refused to accept the offer. Houser Decl. ¶ 79.

The FDR contract contains a provision stating that "[t]his Agreement is governed by the laws of the State of California, without regard to the conflict of law rules of that state." *See* Epstein Decl. Ex. A, FFN 006562; Ex. B, FFN 048974. Moreover, FDR is headquartered in California and plaintiffs aver that FDR's conduct occurs in California as well. Plaintiffs thus claim that California laws apply to FDR in its relation with not only California consumers, but also consumers in other states. Moreover, plaintiffs contend that because California law applies to FDR, it also applies to RMBT and GCS, who allegedly acted as co-conspirators in FDR's plan. Presently before the Court is plaintiffs' motion to

United States District Court
For the Northern District of California

3

United States District Court
For the Northern District of California

1    certify a nationwide class.

2

3                          **LEGAL STANDARD**

4            The decision whether to certify a class is committed to the discretion of the district court within

5    the guidelines of Federal Rule of Civil Procedure 23.  Fed. R. Civ. P. 23; *Cummings v. Connell,* 316

6    F.3d 886, 895 (9th Cir. 2003).  A court may certify a class if a plaintiff demonstrates that all of the

7    prerequisites of Federal Rule of Civil Procedure 23(a) have been met, and that at least one of the

8    requirements of Federal Rule of Civil Procedure 23(b) has been met.  Fed. R. Civ. P. 23; *Valentino v.*

9    *Carter-Wallace, Inc.,* 97 F.3d 1227, 1234 (9th Cir. 1996).

10           Rule 23(a) provides four prerequisites that must be satisfied for class certification: (1) the class

11   must be so numerous that joinder of all members is impracticable, (2) questions of law or fact exist that

12   are common to the class, (3) the claims or defenses of the representative parties are typical of the claims

13   or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests

14   of the class.  Fed. R. Civ. P. 23(a).

15           A plaintiff must also establish that one or more of the grounds for maintaining the suit is met

16   under Rule 23(b), including (1) that there is a risk of substantial prejudice from separate actions; (2) that

17   declaratory or injunctive relief benefitting the class as a whole would be appropriate; or (3) that common

18   questions of law or fact predominate and the class action is superior to other available methods of

19   adjudication.  Fed. R. Civ. P. 23(b).

20           In determining the propriety of a class action, the question is not whether the plaintiffs have

21   stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are

22   met.  *Staton v. Boeing Co.,* 327 F.3d 938, 954 (9th Cir. 2003); *Eisen v. Carlisle & Jacquelin,* 417 U.S.

23   156, 178 (1974).  The court must accept as true the substantive allegations made in the complaint.  *In*

24   *re Petroleum Prods. Antitrust Litig.,* 691 F.2d 1335, 1342 (9th Cir. 1982); *Blackie v. Barrack,* 524 F.2d

25   891, 901 (9th Cir. 1975).  However, although the court may not require preliminary proof of the claim,

26   it "need not blindly rely on conclusory allegations which parrot Rule 23 requirements. Courts may also

27   consider the legal and factual issues presented by plaintiff's complaint."  2 Alba Conte & Herbert B.

28   Newberg, Newberg on Class Actions, 7.26 (4th ed. 2005).  The court should conduct an analysis that

is as rigorous as necessary to determine whether class certification is appropriate. *Gen. Tel. Co. of the Sw. v. Falcon,* 457 U.S. 147, 161 (1982).

### DISCUSSION

Plaintiffs' SAC pleads four causes of action against defendants: (1) unfair competition in violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200; (2) violation of the federal Credit Repair Organization Act ("CROA"), 15 U.S.C. § 1679b; (3) violation of California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750 *et seq.*; and (4) negligence in violating California's "prorater" statute, Cal. Fin. Code § 12315.1. The majority of the parties' arguments focus on the first two claims.

California's UCL prohibits "any unlawful, unfair or fraudulent business act or practice." *Cel-Tech Communic'ns, Inc. v. Los Angeles Cellular Tel. Co.,* 973 P.2d 527, 539 (Cal. 1999); Cal. Bus. & Prof. Code § 17200 *et seq.* "By proscribing 'any unlawful' business practice, section 17200 'borrows' violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable." *Id.* at 539-40 (citation omitted). In their motion, plaintiffs set forth several independent violations that would give rise to a UCL claim. First, they argue that FDR's program causes an "unlawful" act of intentionally interfering with contractual relations by allegedly instructing clients to stop making payments to their creditors. Second, plaintiffs allege that FDR's advertising is false and misleading, thus giving rise to a separate UCL violation. Third, and most significantly, plaintiffs argue that FDR's conduct violates California's prorater statute, California Financial Code § 12000 *et seq.* Accordingly, plaintiffs argue that the predominant issues in this litigation are whether FDR was a prorater, whether it was licensed as a prorater, and whether its retainer, service and cancellation fees violated this statute. SAC ¶ 48. Plaintiffs also contend that the alleged violations of the CROA and CRLA are predominant issues that serve not only as independent claims but further give rise to UCL claims. *Id.*

Defendant FDR and defendants RMBT and GCS have filed separate oppositions in this matter

which, taken in sum, contest each element of the class certification inquiry.[3]  The most persuasive arguments revolve around whether the named plaintiffs are typical of the class  and whether common issues of law and fact predominate.  As a preliminary matter, however, defendants collectively argue that it would be improper to apply California law to a nationwide class where the litigation includes both out-of-state defendants, and out-of-state plaintiffs.  Plaintiffs' federal CROA claim requires no choice of law analysis as its application would be uniform in all states.  Plaintiffs' other theories, however, rely on California's unfair competition laws, consumer rights laws and debtor-creditor laws which may be in conflict with the laws of other states.  Thus, the Court finds it must undertake a choice-of-law analysis to determine which law(s) should apply to a nationwide class.  The Court will discuss the choice-of-law issue before turning to the Rule 23 elements.

## I.        Choice of law

"When a federal court exercises supplemental jurisdiction, 'the federal court applies the choice-of-law rules of the forum state,' which in this case is California." *Fin., Inc. v. Gen. Elec. Capital Corp.,* 96 F.3d 1151, 1164 (9th Cir. 1996) (quoting *Paracor Fin., Inc. v. GE Capital Corp.,* 96 F.3d 1151, 1164 (9th Cir. 1996)).  California requires a court to conduct a choice-of-law analysis for each claim or issue.  *Washington Mutual Bank, FA v. Superior Court,* 15 P.3d 1071, 1081 (Cal. 2001). Moreover, California has two separate choice of law analyses depending on whether the parties have contractually agreed to be bound by the law of a certain jurisdiction.  *Id.* at 1077.   In some circumstances, where the parties have a contractual agreement but not all claims fall within the scope of the choice of law clause, or where the clause is deemed unenforceable, "a trial court considering nationwide class certification might be required to utilize both [the contractual analysis and the governmental interest analysis]." *Id.*

---

[3]Although RMBT and GCS actually filed separate opposition papers, they are represented by the same counsel and each fully incorporate the arguments of the other.  Accordingly, the substance of the arguments is coextensive.

United States District Court
For the Northern District of California

### A.   Contractual choice-of-law agreement

The standard FDR contract states that "[t]his Agreement is governed by the laws of the State of California, without regard to the conflict of law rules of that state." Epstein Decl. Ex. A, FFN 006562; Ex. B, FFN 048974. Thus, the Court must first determine whether the party advocating enforcement of the clause (here, plaintiffs) has shown that the various claims of putative class members fall within its scope. *Washington Mutual,* 15 P.3d at 1078. In California, scope is interpreted broadly and it is generally presumed that "when a rational businessperson enters into an agreement establishing a transaction or relationship and provides that disputes arising from the agreement shall be governed by the law of an identified jurisdiction, the logical conclusion is that he or she intended that law to apply to *all* disputes arising out of the transaction or relationship." *Id.* (quoting *Nedlloyd Lines B.V. v. Superior Court,* 834 P.2d 1148, 1154 (Cal. 1992)). Moreover, in California, the *Nedlloyd* analysis "is properly applied [even] in the context of consumer adhesion contracts." *Washington Mutual,* 15 P.3d at 1079. Plaintiffs' claim under the CLRA is premised on an allegedly unconscionable provision in the contract and thus falls squarely within the scope of the contract. Plaintiffs' remaining state law claims under the UCL and California's prorater statute also arguably arise out of each parties' contractual relationship with FDR, since the present dispute arises out of the relationship formed by the parties' contract.[4]

Having determined that plaintiffs' claims fall within the scope of the contract, the Court must next determine whether the choice-of-law clause is enforceable. *Id.* at 1078. In analyzing the enforceability of a contractual choice-of-law provision, "California courts shall apply the principles set forth in Restatement section 187, which reflects a strong policy favoring enforcement of such provisions." *Nedlloyd,* 834 P.2d at 1151. The Restatement (Second) of Conflicts of Law § 187(2), in turn, provides:

> The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or (b) application of the law of

---

[4]Moreover, as discussed *infra,* regardless of the choice-of-law clause, the UCL and prorater claims may be applied to the nationwide class since the challenged conduct occurred within California.

the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

The parties do not dispute that under subpart (a), the selection of California as a forum state in FDR's contract bears a substantial relationship to the parties and the transaction because FDR is headquartered in San Mateo and operates mainly in the state of California.  Moreover, plaintiffs argue there is no conflict under subpart (b) since the application of California law obviously is not contrary to the fundamental policy of California, which plaintiffs argue would otherwise govern a dispute arising in this state.  Therefore, plaintiffs argue that the provision should be enforced.

Defendants contend that plaintiffs make the wrong inquiry and under subpart (b) it is not the fundamental policy of California but rather the laws of the state where each putative plaintiff resides that would otherwise govern the parties' dispute.  Indeed, the analysis under subpart (b) does not always "require examination of the fundamental policy of the forum state (e.g., California here), but could in some instances necessitate consideration of the fundamental policy of a third state whose law would apply under the rule of Restatement section 188 in the absence of an effective choice of law." *Washington Mutual,* 15 P.3d at 1078, n.5.  Under section 188 of the Restatement, it is the law of the state with the most significant relationship to the transaction and the parties that otherwise governs. Restatement (Second) of Conflict of Laws § 188.  One significant factor to consider in this analysis is the place of the contract performance. *Id.* Comment e ("The state where performance is to occur under a contract has an obvious interest in the nature of the performance and in the party who is to perform.").  As discussed in greater detail below, because FDR negotiated with creditors and operated out of California, the Court finds that absent an effective choice of law provision, California law would govern the dispute between FDR and its clients.  Accordingly, plaintiffs' analysis under the Restatement is appropriate and the choice-of-law clause in plaintiffs' contract with FDR is enforceable.[5]

---

[5]Both parties bring to the Court's attention a recent district court decision certifying a statewide Washington class action against FDR for similar conduct. *Carlsen v. Freedom Debt Relief, LLC,* No. 09-55, 2010 U.S. Dist. LEXIS 29056 (E.D. Wash. Mar. 26, 2010).  While the court found certification appropriate, it also found FDR's choice of law provision to be "substantively unconscionable under Washington law." *Id.* at *19 (finding FDR's contract was permeated with unconscionable provisions such that under Washington law, the choice of law provision was also unenforceable).  Although

**B.      Governmental interest analysis**

Even assuming plaintiffs' claims were not covered by the scope of the contract, under the governmental interest analysis, nationwide application of California law is still proper.   Under California's choice-of-law analysis, where the parties have not contractually agreed on the applicable law or where plaintiffs' claims do not arise under the contract provision, "but the action involves the claims of residents from outside California, the trial court may analyze the governmental interests of the various jurisdictions involved to select the most appropriate law." *Id.* at 1077.  Under this three-step analysis, "the foreign law proponent must identify the applicable rule of law in each potentially concerned state and must show it materially differs from the law of California." *Id.* at 1080.  If the laws are materially different, the second step is to "determine what interest, if any, each state has in having its own law applied to the case." *Id.*  Only if the foreign law proponent satisfies its burden of showing the first two elements does the court then "determine whose interests would be more impaired if its law were not applied." *Id.* (citation and quotation marks omitted).

Here, it is defendants who advocate for application of foreign law(s) and thus it is their burden to show that the rule of law in those states is "materially different" from California law.  Defendants have not done so for any of plaintiffs' claims under either the UCL or the prorater statute.  Moreover, as explained below, California has a substantial interest in having its own laws applied here.

In considering the nationwide applicability of a UCL claim, it has been noted that "California has a clear and substantial interest in preventing fraudulent practices in this state and a legitimate and compelling interest in preserving a business climate free of fraud and deceptive practices, and for that reason has a legitimate interest in extending state-created remedies to out-of-state parties harmed by wrongful conduct occurring in California." *Norwest Mortgage, Inc. v. Superior Court,* 85 Cal. Rptr. 2d 18, 25 (Cal. Ct. App. 1999) (quoting *Diamond Multimedia Systems, Inc. v. Superior Court,* 968 P.2d 539, 556 (Cal. 1999) (quotations omitted)).  Thus, because California has a "clear and substantial interest" in preventing unfair business practices and defendants have failed to point to any actual conflict

_____

defendants argue this shows that other states might find FDR's choice-of-law clause to be unenforceable, this Court is not applying Washington law and under the choice-of-law rules of California, the provision is enforceable.

United States District Court
For the Northern District of California

in another state's unfair competition law, the first two steps of the governmental interest test weigh in favor of applying California law.  The Court need not proceed to the third step since "[t]he trial court may properly find California law applicable without proceeding to the third step in the analysis if the foreign law proponent fails to identify any actual conflict or to establish the other state's interest in having its own law applied."  *Id.* at 1081.[6]

The Court reaches the same conclusion on plaintiffs' prorater claim.  Defendants have not shown any actual conflict under state debtor laws.[7]  Moreover, as with California's UCL, the prorater statute may also be applied to non-resident defendants where the conduct giving rise to liability occurs within the state of California.  In *People ex rel. DuFauchard v. U.S. Financial Management*, *Inc*., 87 Cal. Rptr. 3d 615, 627 (Cal. Ct. App. 2009), the California Court of Appeals held that under the prorater statute, the commissioner of the California Department of Corporations was authorized to subpoena records of non-California residents to determine whether conduct that occurred in California violated the statute. The court noted that nothing in the prorater statute indicates "that the law is inapplicable to transactions involving non-California residents," and explained that "[t]he presumption against extraterritoriality does not preclude the application of California law to conduct that occurs in California, even where that conduct involves non-California residents."  *Id.*  Here, the majority of FDR's conduct which may give rise to liability – mainly FDR's advertising and representations to clients, as well as any negotiations with creditors – occurs in California.[8]  Accordingly, to the extent FDR's conduct occurs in the state of

---

[6]Moreover, it has been held that the UCL may properly be applied to claims by residents of California regardless of where the defendant's conduct occurs, or to claims of non-resident plaintiffs so long as the defendant's conduct occurred in California.  *Norwest,* 85 Cal. Rptr. 2d at 23.  Such is the case here.

[7]While RMBT and GCS argue that they are exempt as "banks" under California's prorater law and provide a chart of the statutes and various exemptions under the fifty states laws, *see* Epstein Decl., Exh. E, as proponents of applying foreign laws, they do not meet their burden of explaining why application of California law would present an actual conflict.  Moreover they do not show any exemption under these laws for banks who allegedly aid non-banks in violating the law, which is plaintiffs' theory here.

[8]FDR claims that it conducts business outside of California when it enters into contracts with non-California residents.  *See* Houser Decl. ¶ 81.  However, the fact that FDR contracts with non-California residents does not mean it conducts business in other states for purposes of determining the applicability of California law.  FDR also mentions that its parent company, Freedom Financial Network LLC ("FFN"), which is headquartered in San Mateo, CA, also  maintains an office in Phoenix, Arizona.

California, or involves California residents, the Court finds it is appropriate to apply the prorater claims brought against FDR to the nationwide class.

Finally, plaintiffs argue that since California law applies to FDR's conduct, it also applies to out-of-state defendants RMBT and GCS for allegedly conspiring with FDR.  Under California law, "the effect of charging conspiratorial conduct is to implicate all who agree to the plan to commit the wrong as well as those who actually carry it out."  *Wyatt v. Union Mortg. Co.,* 598 P.2d 45, 51 (Cal. 1979). In the unfair competition context, a party conspiring with another to commit fraud or misrepresentations "is liable equally with those who actually make the misrepresentations."  *People v. Bestline Products, Inc.,* 132 Cal. Rptr. 767, 792 (Cal. Ct. App. 1976).  Although both out of state defendants argue that it is improper to apply California law to their banking conduct that did not occur in California, the conduct which allegedly gives rise to liability is not the banking practices which occurred outside the state, but FDR's conduct that occurred within the state.  Thus, since it is proper to apply California law to FDR, and taking plaintiffs' allegations as true, it is appropriate to apply California law to the out-of-state defendants.

## II.      Rule 23(a) Requirements

### A.      Numerosity

Defendant GCS argues that plaintiffs fail to allege that the class size is "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  However, there is no real dispute that the proposed class is sufficiently numerous.  Plaintiffs estimate that during the class period, FDR signed up roughly 11,600 customers in California and 65,000-66,000 nationwide.  Mot. for Class Cert. 19, Ex. 43, 67.  Additionally, in RMBT's opposition, it alleges that the number of individuals who created an SPA account was 45,980 nationwide and 8,305 in California.  Thus, the numerosity requirement is clearly satisfied.

### B.      Commonality

--------------------------------------------------------

*Id.* ¶ 10.  It is, however, unclear what conduct, if any, occurs in FFN's Arizona office.

United States District Court

For the Northern District of California

Rule 23(a)(2) requires that there be some question of law or fact common to the class as a whole. Rule 23(a)(2)'s commonality requirement has been "construed permissively," and its requirements deemed "minimal." *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1019 (9th Cir. 1998). "The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Id.*

Plaintiffs allege that all class members' claims rely on common questions of law and thus meet the Rule 23(a)(2) requirement. RMBT and GCS contend that it is improper to apply California law to a nationwide class and thus argue that all members of the putative class do not face common questions of law. However, as discussed above, the Court finds that California law is applicable to the nationwide class. FDR does not directly oppose the validity of plaintiffs' commonality showing, and the Court agrees with plaintiffs that this case presents a number of overarching legal questions that are common to all members of the proposed class. Mainly, the common questions revolve around whether defendants' program violates California's UCL and prorater statutes and the federal CROA statue. Therefore, the Court finds that Rule 23(a)(2)'s commonality requirement is satisfied.

## C.      Typicality

Rule 23(a)(3) requires plaintiffs to show that the named plaintiffs' claims are typical of those of the class. "Under the rule's permissive standards, representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon*, 150 F.3d at 1020. Defendants assert that both named plaintiffs are atypical of the putative class for several reasons.

### 1.      CROA Claim

Under this claim, plaintiffs allege FDR charged up front fees before credit repair services were fully performed in violation of section 1679b(b) of CROA. 15 U.S.C. § 1679b(b). To be covered by the statute, FDR must be deemed a credit repair organization ("CRO"). The statute provides a definition: CRO "means any person who uses any instrumentality of interstate commerce or the mails to sell, provide, or perform (or represent that such person can or will sell, provide, or perform) any

service, in return for the payment of money or other valuable consideration, for the express or implied purpose of – (I) improving any consumer's credit record, credit history, or credit rating; or (ii) providing advice or assistance to any consumer with regard to any activity or service described in clause (I)." 15 U.S.C. § 1679a(3).

FDR argues that the named plaintiffs are not typical of all class members with respect to the CROA claim because both plaintiffs testified at their depositions that they did not seek credit repair services from FDR, and further acknowledged in their contracts that FDR would not assist them with improving their credit score. *See* Arita Depo. 146:2-4; Estrella Depo. 63:13-64:1. Plaintiffs allege that their specific desire to receive credit repair services does not influence the question of whether or not FDR was acting as a CRO by making written and verbal representations to its clients that allegedly imply an ability to improve the consumers' credit rating.

In determining whether an entity is a CRO, the Court should focus on the conduct of the defendant and not the conduct or intentions of the plaintiff. *Helms v. Consumerinfo.com, Inc.,* 436 F.Supp.2d 1220, 1231 n.13 (N.D. Ala. 2005) ("In determining whether Defendant is a credit repair organization, the Court need not limit itself to only those webpages or statements which Plaintiff specifically recalls seeing. Rather, the Court may look to the entire nature of Defendant's business and the representations that it makes in order to arrive at a conclusion. See generally §§ 1679a -- 1679g."). Plaintiffs point to uniform representations by FDR concerning its alleged credit repair activities. Although FDR contract provisions state that "FDR does not claim to be able to improve Client's credit rating or report," FDR Ex. C, D § 3, plaintiffs allege that it was standard procedure for FDR to inform clients that it would "request that [the consumer's] creditors report to the credit rating bureaus that [the consumer's] accounts are 'settled in full,' 'settled,' 'paid,' or 'settled for less than the full amount," SAC ¶ 39. Plaintiffs additionally allege that FDR counselors receive scripts which instruct them to advise consumers on ways in which their credit scores may be improved. Mot. for Class Cert. 18. Thus, because plaintiffs allege FDR's conduct was systematic, the named plaintiffs' CROA claims are reasonably co-extensive with those of the rest of the putative class. The named plaintiffs have therefore satisfied the typicality requirement for this claim.

**United States District Court**
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 2.      UCL Claims

Plaintiffs allege that the predicate violations giving rise to the UCL claim include: (1) violation of the CROA statute; (2) violation of the prorater statute; (3) false and misleading advertising; and (4) tortious interference with contractual relations. As discussed above, the named plaintiffs satisfy Rule 23's typicality prong for the CROA claim; typicality as to the remaining claims will be discussed in turn.

### a.      Prorater claim

Under California law, "[a] prorater is a person who . . . engages in . . . the business of receiving money or evidences thereof for the purpose of distributing [it] among creditors in payment or partial payment of the obligations of the debtor." Cal. Fin. Code § 12002.1. Under this statute, companies acting as proraters must operate with a valid license and are prohibited from charging excessive fees. *Id.* § 12314. The remedy for a violation of this statute is voiding the contract and requiring the prorater to return all charges received from the debtor. *Id.* § 12316.

FDR argues that because it never received money directly from either named plaintiff, the plaintiffs are not typical of the putative class members. However, FDR argues elsewhere that it did not receive money directly from *any* plaintiff, FDR Oppo. 3:12-13; thus, Ms. Arita's and Ms. Estrella's claims are typical in that respect. Moreover, plaintiffs argue that FDR cannot escape the "prorater" label simply by relying on an out-of-state bank and its agent (RMBT and GCS) to hold customer funds and disburse them to creditors. Plaintiffs argue that by instructing clients to deposit funds in an SPA and having GCS distribute them, FDR constructively received the funds and may therefore be found to be a prorater. California courts have noted that if a defendant has "managed to 'receive' the money of [its] customers in all but name, then [its] conduct is precisely that which the [prorater] statute has targeted." *Nationwide Asset Servs., Inc. v. DuFauchard,* 79 Cal. Rptr. 3d 844, 848 (Cal. Ct. App. 2008) (finding defendant to be in constructive receipt of funds where customer deposited funds with a separate entity and the client had only limited access to the funds). FDR attempts to distinguish *Nationwide* by arguing that, unlike in that case, FDR's clients did not completely cede control of their funds, and FDR therefore did not "receive the money of [its] customers in all but name." Whether these factual issues are eventually resolved in FDR's favor, however, the question appears to be uniform as to all FDR's clients

14

**United States District Court**
For the Northern District of California

1   who opened SPAs with RMBT.  In order for the named plaintiffs to have a claim that is typical of the

2   class, the Court finds it appropriate to limit the class to individuals who opened SPAs at RMBT.  Ms.

3   Estrella's and Ms. Arita's claims therefore appear to be typical of any other consumer who by contract

4   had a similar arrangement with FDR.[9]

5

6                              **b.        False and misleading advertising**

7        Plaintiffs allege that FDR's advertising practices violate the UCL as they are false and

8   misleading.  In particular, plaintiffs allege that FDR's failure to include statistics on its attrition rates

9   gives clients a false impression of the program's success rate.  Moreover, plaintiffs allege that FDR fails

10  to warn clients that their debt will likely increase while they wait for sufficient funds to accumulate, and

11  that the 40-60% savings FDR advertises is calculated after the debt has accumulated for several months.

12  Additionally, plaintiffs assert that the fine print contained in the contract makes the "money back

13  guarantee" deceptive.  Mot. for Class Cert. section III. B.

14        In order to prove a UCL fraud claim, a plaintiff must show actual reliance.  *In re Tobacco II*

15  *Cases,* 207 P.3d 20, 39 (Cal. 2009).  Here, FDR argues that neither plaintiff can show typicality under

16  this claim because reliance is an individualized inquiry.  Individualized reliance may be presumed,

17  however, where the alleged misrepresentation is material.  *Id.* at 40-41.  "A misrepresentation is judged

18  to be 'material' if 'a reasonable man would attach importance to its existence or nonexistence in

19  determining his choice of action in the transaction in question.'"  *Id.* at 39 (quoting *Engalla v.*

20  *Permanente Medical Group, Inc.* 938 P.2d 903, 919 (Cal. 1997)).  For purposes of the class certification

21  inquiry, plaintiffs have sufficiently alleged that the misrepresentations they have identified were

22  material.  Although plaintiffs do not expressly use the word "material" to describe the omissions they

23  have identified, plaintiffs argue that such information was important and that it would have influenced

24  their decisions whether to enroll in the program.  Moreover, the fact that the named plaintiffs signed and

25

26        [9]It has been noted that in 2008 FDR changed its policy for California residents to require that
27  clients expressly authorize settlements with their creditors, and the named plaintiffs enrolled in the
    program in California in 2008.  Although FDR argues this may affect the prorater determination, it does
28  not fully explain why or how this change makes the named plaintiffs' legal remedies or defenses
    atypical of other class members and the Court finds this does not preclude a finding of typicality.

United States District Court

For the Northern District of California

1  understood the "TASC Standard Disclosure Statement" describing certain features of the program does

2  not make them atypical of the class as this was a standard disclosure signed by all of FDR's clients.

3  Housser Decl. ¶ 32.[10]   Accordingly, because plaintiffs' allegations are amenable to proving reliance on

4  a classwide basis, and because FDR does not argue that any of its customers received disclosure

5  statements that were materially different from those received by the named plaintiffs, Ms. Estrella and

6  Ms. Arita are typical of the proposed class.

8              **c.**        **Intentional interference with contractual relations**

9        Plaintiffs' final claim under the UCL is that FDR's program is unlawful in that it causes an

10  intentional interference with contractual relations.  Plaintiffs allege that FDR's program interferes with

11  the creditor-debtor contract by instructing plaintiffs to stop making monthly payments to creditors and

12  instead instructs them to funnel that money into their SPAs.  FDR asserts that the named plaintiffs are

13  not typical of class members because when they began the program, both Ms. Estrella and Ms. Arita

14  informed FDR that they were already unable to make payments to their creditors.  FDR therefore alleges

15  it would not be liable for any breach that occurred as a result of its conduct because such a breach was

16  already ongoing.  As an initial matter, FDR does not explain how any breach on plaintiffs' part nullifies

17  the claim for tortious interference.  Additionally, FDR does not explain how plaintiffs are atypical of

18  class members.  CEO Housser states that "[i]f Ms. Estrella and Ms. Arita were able to continue making

19  monthly payments to the satisfaction of their creditors without difficulty, they would not be a good fit

20  for FDR's program, and their creditors would not be willing to negotiate a reduced settlement with

21  FDR."  Housser Decl. ¶ 49.  Thus it appears that most, if not all, of the persons who consulted FDR in

22  the first place did so because they had fallen behind on payments to creditors; indeed, this appears to

23  be a prerequisite to enrolling in FDR's program.  Accordingly, plaintiffs have satisfied their burden of

24  showing that they are typical of the class with respect to the tortious interference claim.

25        In sum, the named plaintiffs' claims for various violations under the UCL are reasonably co-

---

27        [10]While FDR allegedly used a separate disclosure statement prior to 2008, see Housser Decl. ¶

28  56; FDR Appx. Ex. Q,  there do not appear to be significant differences with respect to the disclosures
made therein.

extensive with the remainder of the class.  Any variations appear to be minimal at this time and the named plaintiffs have thus shown typicality on this issue.

### 3.      Negligence and CLRA claims

Plaintiffs' third and fourth causes of action, for negligence in violating a portion of the prorater statute and for an alleged unconscionable contract provision in violation of the CLRA do not require much discussion. Plaintiffs plead that FDR negligently violated section 12315.1 of the prorater statute, Cal. Fin. Code. § 12315.1, by not contacting the consumers' creditors within 5 days of executing an agreement to advise creditors of the minimum monthly payment that the consumers intended to pay. SAC ¶¶ 73-74.  Because this claim is based on systematic conduct by the defendants, and plaintiffs have made a typicality showing as to the prorater determination, the named plaintiffs are typical of the class.

Plaintiffs' CLRA claim is based on a provision in FDR's contract which states that consumers who fail to make monthly payments to their SPA or who voluntarily withdraw from the program forfeit their retainer and service fees.  Plaintiffs allege this provision is unenforceable under California Civil Code § 1671 and thus is unconscionable under section 1770(a)(17) of the CLRA.  To bring a claim under the CLRA, a plaintiff must suffer actual damages, that is, "some kind of tangible increased cost or burden to the consumer."  *Meyer v. Sprint Spectrum L.P.,* 200 P.3d 295, 301 (Cal. 2009).  Both named plaintiffs did not receive a refund of their service or retainer fees and thus can arguably show tangible damages.  However, they seek to represent a nationwide class of consumers regardless of whether a refund was provided.  In order for the named plaintiffs to be typical and to assert a CLRA claim on behalf of the class, the class must be comprised of individuals who did not receive a full refund of their retainer and service fees.  The class description must be revised accordingly.

### D.      Adequacy

"Resolution of two questions determines legal adequacy: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?"  *Hanlon,* 150 F.3d at 1020. Defendants do not challenge the qualifications of plaintiffs' counsel, and the Court finds that plaintiffs'

17

counsel is qualified and able to litigate this case.  Additionally, defendants do not argue that the named plaintiffs have any conflict of interest.  Rather, defendants focus their arguments on the named plaintiffs' knowledge about this suit.

Defendants rely on the fact that, as of the time the plaintiffs were deposed, neither plaintiff had spoken to the other about this case and neither indicated a belief that they would need to work together. Arita Depo. 23-24; Estrella Depo. 141-42.  Defendants also attack plaintiffs' adequacy as class representatives by pointing out plaintiffs' inability to define the class, the minimal time plaintiffs had spent on the case as of the time of their depositions, and the fact that both were allegedly unaware of counsel's attempt to intervene in an action brought against FDR in San Mateo.[11]  Plaintiffs' counsel has submitted evidence to dispute this last point and to show that plaintiffs were, in fact, aware of counsel's attempt to intervene in the San Mateo action.  *See* Talley Reply Decl. Ex. 50, 51.  Moreover, both plaintiffs have testified to their willingness to represent the class and have stated an understanding of their duties as class representatives.  Ms. Arita testified at her deposition that she understands she has obligations and responsibilities in representing the class to appear at depositions and go to the trial. Arita Depo, 21:18-22.  She has also stated that she believes she is obligated to make sure the lawyers are doing their jobs.  *Id.* at 22:8-9.  Similarly, Ms. Estrella testified that she is a plaintiff in this lawsuit pending in San Francisco and is representing a class action against Freedom Debt Relief.  Estrella Depo. 16:15-22.  That neither party can define the precise scope of the class or name all of the causes of action in their proper legal terms is not dispositive of the adequacy issue.  Plaintiffs have demonstrated adequacy to the Court's satisfaction.

---

[11]The California Department of Corporations and the San Mateo County District Attorney's Office initially filed a cease and desist order against FDR for what was  believed to be prorater acts. *People v. Freedom Debt Relief, LLC, et al.,* Case No. CV 477991.  The parties eventually reached a settlement that allegedly determined that FDR is not a prorater.  Although this settlement is not before the Court, neither does its decision bind the Court in this class certification motion where the merits are not at issue.

**United States District Court**
For the Northern District of California

1  **III.    Rule 23(b) Requirements**

2      **A.    Rule 23(b)(1)(A)**

3          Plaintiffs seek certification under two alternative provisions of Rule 23(b): 23(b)(1) and 23(b)(3).

4  Under Rule 23(b)(1), a class may be certified if it meets all of the Rule 23(a) requirements and

5  "prosecution of separate actions . . . would create a risk of inconsistent or varying adjudications with

6  respect to individual members of the class which would establish incompatible standards of conduct for

7  the party opposing the class."  Fed. R. Civ. P. 23(b)(1)(A).  However, as FDR points out in its

8  opposition, "[c]ertification under Rule 23(b)(1)(A) is not appropriate in an action for damages." *Zinser*

9  *v. Accufix Research Inst., Inc.,* 253 F.3d 1180, 1193 (9th Cir. 2001).  Plaintiffs do not address this point

10 in their reply.  Since plaintiffs are primarily seeking damages, they may not proceed under Rule 23(b)(1)

11 and must therefore satisfy Rule 23(b)(3).

12

13      **B.    Rule 23(b)(3): Predominance of common issues**

14         Under Rule 23(b)(3), plaintiffs must first show that "questions of law or fact common to class

15 members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3).

16 The "'predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant

17 adjudication by representation.'" *Hanlon,* 150 F.3d at 1022 (quoting *Amchem Prods., Inc. v. Windsor,*

18 521 U.S. 591, 623, 117 (1997)).  The predominance analysis goes beyond the commonality requirement

19 of Rule 23(a)(2) by assuming the existence of some common questions of law or fact and asking

20 whether these issues predominate over issues that arise based on the individual differences between

21 class members. *See id.*  Defendants argue that individual questions of both law and fact predominate.

22         Having established that it is appropriate to apply federal and California law to the present

23 dispute, the Court must also determine whether common issues under these laws predominate.  It is clear

24 that the focus of the litigation is whether defendant FDR violated California law by charging excess fees

25 for its debt reduction program and whether it acts as a credit repair organization.  FDR has not identified

26 any individual questions that would overwhelm the largely common questions presented by plaintiffs'

27 claims.  Therefore, the Court concludes that plaintiffs have satisfied their burden of showing that

28 common questions of law predominate.

United States District Court
For the Northern District of California

Defendants also contend that individual issues of fact predominate over any common issues. Defendants claim that each class member's individual scenario must be assessed to determine whether FDR acted as a prorater, and argue that there is no uniform measure of restitution under the prorater statute. However, as discussed above, the contractual agreement between FDR and its clients, in particular the clients with funds at RMBT, would place the putative class members in the same or similar factual circumstances; thus, the common issue of whether FDR acted as a prorater predominates over individual issues. Additionally, if FDR is found to have violated the statute, there is a uniform measure of restitution as the remedy under the prorater statute is a refund of all charges received from the debtor. Cal. Fin. Code § 12316. To the extent the amount of restitution will require an examination of each class member's circumstances, this is a damages issue that does not affect the question of predominance on the merits.

As to the UCL claims of misrepresentation, FDR argues that there must be an individualized inquiry into whether each class member actually relied on the purported misrepresentations. As discussed previously, however, if the representations are material, reliance may be presumed. Thus, if plaintiffs can prove materiality, the factual issues surrounding the misrepresentations will be common to all class members. Defendant FDR also argues that the UCL claim of contractual interference would depend on the individual relationship between each class member and his or her creditor. However, if FDR's policy is, as plaintiffs allege, to inform clients to stop making payments to their creditors, then the interference claim can be proved with common facts that will predominate over any individual questions.

Finally, defendants argue that the CROA claim also depends on individual facts, in particular whether statements were made to all consumers regarding credit repair and how the consumer understood such statements. However, whether or not FDR is acting as a CRO is not dependent on individual facts. Rather, plaintiffs' claim under the CROA focuses on FDR's common representations and its common procedure of requiring payment of fees before providing services. Thus, any individual questions raised by the CROA claim are far outweighed by common questions that can be proved on a classwide basis.

1

**C.      Rule 23(b)(3) Superiority**

Under Rule 23(b)(3), plaintiffs must also demonstrate that a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "Where classwide litigation of common issues will reduce litigation costs and promote greater efficiency, a class action may be superior to other methods of litigation," and is certainly superior "if no realistic alternative exists." *Valentino,* 97 F.3d at 1234-35. Defendants argue that because the laws of several states would govern, the class action would be unmanageable. Because the Court finds that California law applies and that common issues under both California and federal laws predominate, defendants' argument is unconvincing. Moreover, where, as here, the putative class members are already financially burdened, they may have no means of funding individual litigation and many of the members of the putative class likely would not know of their rights to seek a refund for the alleged unlawful fees. In this scenario, a class action will promote efficiency and is superior to other methods of litigation.

**CONCLUSION**

Having concluded that plaintiffs satisfy the requirements of Rule 23(a) and Rule 23(b)(3), the Court hereby GRANTS plaintiffs' motion for class certification and certifies a class consisting of:

All consumers nationwide who paid FDR for debt reduction services during the four years preceding filing of the complaint, who opened an SPA with RMBT and GCS, and did not receive a full refund of fees from FDR. The class will exclude all defendants and all agents, attorneys, and employees of defendants; all members of the California judiciary sitting in judgment on this case; and, plaintiffs' attorneys and their employees; and, all other persons within three degrees of consanguinity of the named defendants, attorneys, employees and judges.

**Counsel are directed to meet and confer concerning the manner, form and content of notice to be provided to the absent class members, and to submit a proposal concerning same to the Court in writing no later than June 18, 2010. The Case Management Conference scheduled for June 3, 2010 is continued to June 25, 2010 at 3:00 p.m.**

**IT IS SO ORDERED.**

Dated: June 2, 2010

SUSAN ILLSTON
United States District Judge