United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HAIDEE ESTRELLA, et al., | No. C 09-03156 SI |
| Plaintiffs, | **ORDER DENYING CROSS-MOTIONS FOR SUMMARY JUDGMENT** |
| v. | |
| FREEDOM FINANCIAL NETWORK, LLC, et al., | |
| Defendants. | |

On February 25, 2011, the Court heard argument on the parties' cross-motions for summary judgment. Having considered the arguments of counsel and the papers submitted, the Court hereby DENIES both motions.

**BACKGROUND**

The subject of this litigation is the legality of a debt reduction program. In the operative complaint, plaintiffs describe defendants' conduct as follows. Freedom Debt Relief, Inc. ("FDR"), along with Freedom Financial Network, LLC, Freedom Debt Relief, LLC, and FDR's Chief Executive Officers Andrew Housser and Bradford Stroh (collectively "Network defendants"),[1] offer a debt reduction service. FDR's advertisements describe its service as "an innovative solution for consumers struggling with large debt burdens and who need debt relief." Second Amended Complaint ("SAC")

---

[1] Plaintiffs argue that the named defendants "are all joint venturers and/or alter egos of each other" and have "created a maze of corporations and LLCs in an effort to siphon off millions of dollars from FDR's operations while attempting to shield themselves from liability." Pl. Opp. at 2.
 Plaintiffs also name Global Client Services ("GCS") and Rocky Mountain Bank and Trust ("RMBT") as defendants in their SAC, but neither is involved in the present motions.

¶ 27, Doc. 84. Upon enrolling in the program, the consumer signs a contract and authorizes an automatic monthly transfer of funds from the consumer's existing bank account to a new Special Purpose Account ("SPA"). After sufficient funds have accumulated in the client's SPA, FDR contacts the client's creditors and attempts to negotiate a settlement of the client's debt for less than what is owed. SAC ¶ 10. Part of the FDR contractual agreement also provides that clients will pay FDR a retainer fee and service fee equal to approximately 15% of their existing debt with the breakdown being approximately 10% for the service fee and 5% for the retainer fee. SAC ¶ 13. These fees are paid directly from the client's SPA; the retainer fees are deducted over the first four months and the service fees are deducted over the following fifteen months. SAC ¶ 13.

On the basis of these and other allegations, plaintiffs plead four causes of action against defendants: (1) unfair competition in violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200; (2) violation of the federal Credit Repair Organization Act, 15 U.S.C. § 1679b; (3) violation of California's Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 et seq.; and (4) negligence. SAC ¶¶ 55-75. These claims are described in more detail in this Court's order certifying a class action. Order Granting Pl. Mot. for Class Cert., Doc. 134.[2] Of import to the motions currently before the Court, the fourth claim, and part of the first claim, are premised on the allegation that defendants are proraters, as defined by California's prorater statute. Cal. Fin. Code §§ 12000 to 12404.

Prior to the commencement of this suit, the California Department of Corporations ("CDOC") issued a Desist and Refrain letter ("D&R") against defendants Freedom Financial Network, Freedom Debt Relief Inc., and Freedom Debt Relief LLC. along with Andrew Housser, Brad Stroh, and a number

---

[2] The class consists of

> All consumers nationwide who paid FDR for debt reduction services during the four years preceding filing of the complaint, who opened an SPA with RMBT and GCS, and who did not receive a full refund of fees from FDR. Residents of the State of Washington are excluded from the class. The class will also exclude all defendants and all agents, attorneys, and employees of defendants; all members of the California judiciary sitting in judgment on this case; and plaintiffs' attorneys and their employees; and, all other persons within three degrees of consanguinity of the named defendants, attorneys, employees and judges.

Order Amending Class Certification at 2, Doc. 148.

1 of others not named in this suit.³ Desist and Refrain Order, SAC, Ex. A. The D&R alleged, among
2 other things, that the Network defendants were acting as unlicenced bill payers and proraters in violation
3 of California's prorater statute. *Id.* ¶ 30. The CDOC subsequently filed suit against the defendants in
4 conjunction with the San Mateo County District Attorney, alleging the same violations of California's
5 prorater laws as well as violations of the state's unfair competition laws. Def. Opp. to Pl. Mot. for
6 Summary Adjudication ("Def. Opp.") at 9. On December 22, 2009, a consent judgment was entered by
7 the parties that allowed FDR to continue operating as before but also required payment of certain costs
8 and fees as well as the creation of a "Refund Fund." Supp. App. of Ex. in Supp. of FDR Opp. to Pl.
9 Mot. for Summary Adjudication, Ex. JJ at 6. The same day, the CDOC withdrew the D&R letter. *Id.*
10 at Ex. II.

11 Presently before the Court are cross-motions for summary adjudication of issues brought by
12 plaintiffs and the Network defendants. Pl. Mot. for Summ. J./Adjudication of the Issues ("Pl. Mot."),
13 Doc. 153 and Def. Mot. for Partial Summ. J. or, Alternatively, Summ. Adjudication of Issues; Mem. of
14 P. & A. in Supp. of Mot. ("Def. Mot."), Doc. 158. Both parties seek summary adjudication in their
15 favor on the question of whether FDR qualifies as a prorater under California Financial Code section
16 12002.1. Pl. Mem. of P. & A. in Supp. of Mot. for Summ. Adjudication ("Pl. Mem."), Doc. 153-1 at 1;
17 Def. Mot. at 1. The Network defendants also ask that, even if FDR is not entitled to summary judgment
18 on the question of whether it functions as a prorater, this Court grant summary judgment on this question
19 with regard to the other Network defendants. Def. Mot. at 17-18. Finally, the Network defendants ask,
20 in the alternative, for summary adjudication regarding each Network defendant's role with regard to
21 each individual element of the same statute. Def. Mot. at 1.

### LEGAL STANDARD

24 Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and
25 any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled

---

27 ³ The CDOC action also involved Alivio Holdings LLC, Alivio Mortgage, LLC, Freedom
28 Tax Relief, Bills.com, Bills.com LLC, and Bills.com Inc. None of these organizations are involved in the present action.

3

to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party, however, has no burden to disprove matters on which the non-moving party will have the burden of proof at trial. The moving party need only demonstrate to the Court that there is an absence of evidence to support the non-moving party's case. *Id.* at 325.

Once the moving party has met its burden, the burden shifts to the non-moving party to "set out 'specific facts showing a genuine issue for trial.'" *Id.* at 324 (quoting then Fed. R. Civ. P. 56(e)). To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

On cross-motions for summary judgment, the burdens faced by the opposing parties vary with the burden of proof they will face at trial. When the moving party will have the burden of proof at trial, "his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." William W. Schwarzer, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 487-488 (1984). In contrast, a moving party who will not have the burden of proof at trial need only point to the insufficiency of the other side's evidence, thereby shifting to the non-moving party the burden of raising genuine issues of fact by substantial evidence. *T.W. Electric*, 809 F.2d at 630 citing *Celotex*, 477 U.S. at 323; *Kaiser Cement*, 793 F.2d at 1103-04.

In deciding a summary judgment motion, the Court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor. *Id.* at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment." *Id.* However, conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). The evidence the parties present must be admissible. Fed. R. Civ. P. 56(c)).

4

Under the California Financial Code, any party that claims an exemption or exception from the Check Sellers, Bill Payers, and Proraters regulations ("Prorater Regulations") bears the burden of proving that exception. Cal. Fin. Code § 12101.5. However, this standard does not apply to this motion because the parties disagree not about exceptions or exemptions, but about whether the Prorater Regulations are triggered at all. Plaintiffs therefore will bear the burden of proof at trial.

**DISCUSSION**

California's UCL prohibits "any unlawful, unfair or fraudulent business act or practice." *Cel-Tech Communic'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 973 P.2d 527, 539 (Cal. 1999); Cal. Bus. & Prof. Code § 17200 *et seq*. "By proscribing 'any unlawful' business practice, section 17200 'borrows' violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable." *Id.* at 539-40 (citation omitted). In their SAC, plaintiffs set forth several independent violations that would give rise to a UCL claim. The third contention, which is the most significant for the purposes of this motion, is that FDR's conduct violates California's prorater statute. Additionally, plaintiffs' negligence claim is premised on their contention that FDR owed them a duty under Section 12315.1 of the prorater statute.

The issue of whether FDR is a prorater is therefore critical; if FDR were found <u>not</u> to be a prorater, plaintiffs' third UCL claim would be eviscerated, along with their negligence claim. By contrast, if FDR <u>were</u> found to be a prorater, plaintiffs would not only succeed in establishing the necessary grounds for their third UCL claim, but also the framework for making their other UCL claims and their negligence claim.

**I.  Both parties fail to establish entitlement to summary adjudication on the question of whether FDR operates as a prorater**

Both parties moved for summary judgment as to whether FDR is a prorater. Plaintiffs argue that FDR is a prorater because FDR has constructive control over its client's funds; or, in the alternative, that FDR is engaged "in part" in the business of prorating. The Network defendants argue that FDR is not a prorater because it "has never received money from debtors for the purpose of making distributions

5

to creditors." Def. Mot. at 18.

### A. The parties fail to establish undisputed facts regarding whether FDR was in constructive receipt of its clients' funds

The California Financial Code defines a prorater as "a person who, for compensation, engages in whole or in part in the business of *receiving money* or evidences thereof for the purpose of distributing the money or evidences thereof among creditors in payment or partial payment of the obligations of the debtor." Cal. Fin. Code § 12002.1 (emphasis added). The level of control exercised over a customer's money is central to the definition of a prorater. The parties agree that FDR did not have actual, literal possession of their clients' funds. Rather, plaintiffs contend (and defendants deny) that the structure of FDR's program was such that FDR had constructive possession of the funds and that the apparent involvement of third parties was nothing more than an elaborate facade.

In *Nationwide Asset Services, Inc. v. DuFauchard*, 164 Cal. App. 4th 1121 (2008), the California Court of Appeal determined that a debt resolution organization, which had constructively received[4] its clients' funds, was in fact a prorater. *Id.* at 1123. The court explained that, if a company has

> managed to 'receive' the money of their customers in all but name, then their conduct is precisely that which the statute has targeted. There would not be any reason to permit them to evade the statute's salutary requirement of subjecting their practices to [CDOC's] licensing oversight for the protection of consumers.

*Id.* at 1126; *see also id.* ("[E]xercising control, even through a third party, over funds to which a customer has only limited access, will result in imputation of possession of the funds.").

Plaintiffs in the present case argue that the "undisputed" facts on the record are essentially identical to those in *Nationwide,* and that FDR should therefore be found definitely to be a prorater. This logic is incorrect for two reason: first, an inspection of the evidence offered by plaintiffs demonstrates that nearly every statement on its "Statement of Undisputed Material Facts" is in fact hotly

---

[4] In *Nationwide*, the court primarily refers to constructive receipt of client funds, although it also mentions constructive possession and treats the concepts as more or less interchangeable. *See, e.g., Nationwide*, 164 Cal. App. 4th at 1124 ("In its adopted decision, [the CDOC] concluded that the receipt of money can be actual or constructive . . . The decision further noted that plaintiffs did not commence providing any services to their customers until the funds were in this constructive form of their possession.") The parties to the present case use the terms "constructive receipt" and "constructive possession" interchangeably as well. Therefore, the Court will not differentiate between the terms at this time although doing so may be necessary at a later point.

6

disputed.[5] *See* Pl. Separate Statement of Undisputed Material Facts in Supp. of Mot. for Summ. Adjudication of Issues ("Pl. Statement of Facts"), Doc. 154. Second, the procedural posture of *Nationwide* is distinct from the situation currently before the Court; therefore, even if plaintiffs had been able to prove that the present facts are the same as those in *Nationwide*, that would not compel this Court to adopt the same decision as in *Nationwide*.

The Network defendants, on the other hand, attempt to distinguish *Nationwide* from the present case categorically. Although there are differences between the two cases, the Network defendants' claim that "the ***evidence*** before this Court establishes unequivocally that ***none of the facts that led to a finding of 'constructive control' apply to FDR***" is simply not correct. Def. Mot. at 20 (emphasis in original). The truth lies somewhere between the allegations made by plaintiffs and the arguments of FDR - the facts of *Nationwide* neither prove FDR's actions to be prorating nor do they prove them not to be prorating.

### 1. The "facts" of the present dispute

The evidence on the record is much more convoluted than the parties make it seem, and it is simply not clear how much control FDR has over clients' funds. It appears that, under FDR's business

---

[5] For example, the twenty-fourth "fact" offered by plaintiffs states: "Rocky Mountain Bank has no record of the consumer who supposedly has an account at its bank and Rocky Mountain Bank is not able to honor any request by a consumer to withdraw, freeze, or otherwise use funds from 'their' account. Consumers can only withdraw funds by going through Global." Pl. Statement of Facts at 5, ¶ 24. The exhibit that plaintiffs reference in support of this "fact," a portion of Douglas McClure's deposition, in reality states:

> Q: If a client of Freedom Debt Relief wanted to withdraw funds from their account at Rocky Mountain Bank, could they contact Rocky Mountain Bank directly to withdraw the funds?
> A: We would refer them to Global to process their request.
> Q: So only Global could take the funds out for the client?
> A: They're the ones we outsourced that function to.

Talley Decl., Ex. 45 at 36:22-37:7. Nowhere in the excerpted portion of Mr. McClure's deposition does Mr. McClure, a designated corporate designee of RMBT, mention RMBT's record-keeping procedures, or whether customers are able to freeze their funds by contacting RMBT directly. Many, if not most, of the other items on plaintiffs' Statement of Facts suffer the same deficiencies.

7

model, clients were asked to open accounts with a third party bank.[6] 95% of them opened accounts at RMBT. The clients would then provide Global, a third party organization, with permission to transfer sizable portions of the money to FDR to cover the fees associated with participating in the program, and permission to transfer other funds directly to the clients' creditors to cover negotiated settlements. Exhibits F through O of the appendix that defendants present in support of their motion, Doc. 161 ("Def. App."), contain the maze of paperwork signed by the named plaintiffs, both in forming their agreements with FDR, and in opening their bank accounts at RMBT.

Much of the evidence cited by both sides is subject to interpretation and does not support a finding that no genuine issue of material fact exists. On the one hand, the plaintiffs signed statements acknowledging that the clients retain control over their bank accounts. *See* Def. App., Ex. N at GCS/RMBT00005 ("I understand that the Account . . . will be my sole and exclusive property; that only I may authorize deposits to and disbursements from the Account; and that I may withdraw funds from and/or close the Account at any time as provided for in the Agreement."). On the other hand, the clients promise to pay a certain amount of money into the accounts each month. *See id.* at Ex. F. at FFN 006563. They promise to release a very high percentage of that money to be paid to FDR each month for the first fifteen months. *Id.* They promise that these fees will be paid "via electronic debit or automatic check relay from" the account. *Id.* at FFN 006564. They give Global permission to release some of those funds to FDR, and they give Global permission to release funds in certain other, nonenumerated situations. *Id.* at Ex. N at GCS/RMBT00005 ("I hereby authorize Bank, through its agent Global . . . to administor [sic] the Account on my behalf by . . . periodically disbursing funds from the Account pursuant to instructions that I may give from time to time. In this regard, I hereby authorize payment from the Account of the fees and charges provided for in this Application and the Agreement."). They agree to be "cooperative" and "expressly agree[] to make timely payments for services rendered and to reimburse FDR for costs . . . ." *Id.* at Ex. F at FFN 006562. Although the client has the right to withdraw from the program completely, exercising that right voids the money-back

---

[6] One of the facts that plaintiffs and FDR dispute is whether clients are required to open accounts. Actual determination of this question is neither possible nor necessary at this juncture. Therefore, the Court's use of the word "asked" should not be interpreted as a finding of fact on this point.

8

guarantee. *Id.* at FFN 006561-12. Additionally, the client must agree that "if [he] terminates th[e] Agreement, all fees paid [] up to the date of withdrawal are non-refundable." *Id.* at FFN 006564. Amendments and modifications by the client must be agreed to in writing - including, it would seem, modification of the automatic electronic debiting of fees and costs. *Id.* Another form clarifies that the client has "custody or control or access to funds set aside for settlement," implying a lack of control over sums set aside to pay FDR. *Id.* at Ex. K at FFN 006569.

Additionally, while the forms at times separate the roles of FDR and Global, ultimately they appear to create a seamless web of a program involving all of the different players. *Id.* at Ex. M (FDR's "Truth in Services Form": "All monies are held in my own Global Client Solutions . . . bank account at Rocky Mountain Bank and Trust."); Ex. N (Global's SPA Application: authorizing payment of the "fees and charges provided for in . . . the Agreement" between clients and FDR); Ex. O (Global "Welcome" letter: discussing the different roles of Global and FDR).

The Court cannot say that these facts compel a finding that FDR is or is not a prorater. There is simply too much ambiguity and too much room for interpretation for these facts to support a decision at the summary judgment stage.

### 2. The procedural posture

Contrary to plaintiffs' assertions, *Nationwide* does not somehow compel a different conclusion. The posture of this case and of *Nationwide* are simply too different for *Nationwide* to do more than shape the legal inquiry in this case. In *Nationwide*, the plaintiff debt resolution companies sought a writ of administrative mandamus after a CDOC decision enjoined them from continuing to operate without a prorater's license. *Id.* at 1123.[7] Although the appellate court performed a *de novo* review, that review

---

[7] This in itself is one crucial distinction between the cases. In *Nationwide*, the CDOC found that Nationwide did have constructive possession of its clients' funds. *Nationwide*, 164 Cal. App. at 1123. In the present case, by contrast, the CDOC withdrew its D&R order against FDR. While the CDOC's decision is not binding on this Court, the fact that both the administrative proceeding and associated lawsuit were dismissed in the present case creates a significant difference between this case and *Nationwide*.

However, contrary to FDR's argument, the withdrawal of the CDOC order does not require the Court to adjudicate this issue in favor of FDR either. While the different results received by Nationwide and FDR during their respective hearings with the CDOC certainly serve to differentiate the two cases,

9

1 was of "the undisputed facts as found in the decision [of the trial court]." *Id.* at 1125. The trial court
2 had found that customers had only limited access to their funds and that customers were required to sign
3 authorization forms that vested control of the funds in either the plaintiff debt resolution companies or
4 their designees. *Id.* at 1123. Moreover, the appellate court in *Nationwide* did not have access to
5 Nationwide's authorization forms and therefore relied completely on the lower court's finding that the
6 forms required customers to "ced[e] control over their funds to Global (which in turn acts as
7 [Nationwide's] agent in directing the transfer of funds to them for their fees and to creditors . . .) without
8 reserving any power to countermand the transfers." *Id.* at 1125-26. Additionally, the appellate court
9 did not explain how the findings related to specific language in any of the agreements, and specifically
10 noted that the decision did not "express any opinion on whether a future form might be structured in
11 such a way as to preclude a finding of constructive receipt." *Id.* at 1126 n.5.

12 An appellate court's inquiry when reviewing the denial of a writ of administrative mandamus
13 is not the same as the inquiry of a trial court deciding whether to grant a motion for summary judgment.
14 The *Nationwide* court asked whether the statute applied given that the company *had been found* to be
15 in constructive control of clients' money. *Nationwide* is primarily a case about statutory interpretation,
16 not about the appropriate way to read evidence. In any event, the *Nationwide* decision also considered
17 evidence of customers' inability to "countermand the transfers" or the required signing of documents
18 "ceding control over their funds" to the alleged prorater's agent, neither of which has been established
19 in this case. *See id.* at 1125-26. The Court cannot tell from the record as it currently exists whether the
20 forms in this case are materially different from those in *Nationwide* or not.[8]

21 While *Nationwide* holds that plaintiffs do not need to prove that FDR had sole, or exclusive,
22 control of its client's accounts, it also suggests that plaintiffs do need to show that FDR had "sufficient
23 control over customers' funds [to] permit disbursements both on behalf of clients and for respondents'

---

they do not show that no reasonable trier of fact could ever find for plaintiffs. The order still required
FDR to pay significant fines and create a "Refund Fund" for, presumably, dissatisfied customers.

[8] Although a copy of all of the authorization forms at issue in *Nationwide* apparently has been submitted to the Court, the quality of the copy is so poor as to make them illegible. *See* Pl. Req. for Judicial Notice in Supp. of Pl. Mem. of P. & A. in Opp. to Def. Mot., Ex. 10 at FFN 032206, Doc. 170. FDR separately presents a single page of an acknowledgment form that appears to be one of the forms at issue in *Nationwide*. Supp. Appendix Ex. HH, Doc. 178.

10

compensation." 164 Cal. App. 4th at 1124. The evidence here shows that many plaintiffs provided Global with the authority to disburse funds to FDR, and perhaps to creditors at FDR's request. But plaintiffs have failed to demonstrate conclusively that FDR had actual access to its clients' accounts, or that Global functioned as a "straw man" to hide FDR's actions. In short, plaintiffs have not provided adequate evidence showing that FDR had constructive possession of its client's funds to entitle them to summary adjudication of that issue.

FDR attempts to distinguish *Nationwide* from the present case categorically, arguing that "***none of the facts that led to a finding of 'constructive control' apply to FDR.***" Def. Mot. at 20 (emphasis in original). The cases are different, but not categorically so. Based on the present record, it is simply not clear whether FDR "receive[d] sufficient control over customers' funds [to] permit disbursements both on behalf of clients and for [FDR's] compensation." For example, in the Agreement between FDR and the clients, FDR stated that it would "inform the Client of the amounts and the terms and conditions of all written settlement agreements. All settlement payments will be made directly to creditors from Client's settlement account." Def. App., Ex. F at FFN 005652. It is not at all clear from this form that a client would need to affirmatively accept the settlement or affirmatively approve the transfer of funds. Nor is it clear what the repercussions would be of the client refusing to agree to the settlement or withdrawing his consent for Global to make disbursements from the account.

Additionally, there is evidence that FDR asked its clients to sign an acknowledgment form sometime in 2008 that states

> Utah, Colorado, Delaware, Minnesota and Illinois Residents: FDR may accept an offer on your behalf only if such offer is for 50% or less than the actual balance of the debt owed at the time of settlement. For offers that are greater than 50% of such amount, FDR must first obtain your express prior consent to the settlement after the creditor has assented.
>
> California Residents: FDR may not accept an offer on my behalf absent my express prior consent to the settlement after the creditor has assented.

*Id.* at Ex. J. It is not clear if FDR actually changed its practices at that time, either in relation to its California clients, or in relation to its clients as a whole. But, seen in the light most favorable to plaintiffs, this acknowledgment form would indicate that FDR often acted without getting additional approvals, that it *could* act without getting additional approvals, and that, perhaps, it "receive[d]

11

sufficient control over customers' funds [to] permit disbursements both on behalf of clients and for [FDR's] compensation." *See Nationwide*, 164 Cal. App. 4th at 1124.

The truth lies somewhere between the allegations made by plaintiffs and the arguments of FDR - the facts of *Nationwide*, and the "facts" presented to this Court, neither prove FDR's actions to be prorating nor do they prove them not to be prorating. The evidence presently before the Court is simply too ambiguous, and the record too thin, to support summary judgment at this time. Both motions for summary judgment on the question of whether FDR is a prorater are therefore DENIED.

### B. Plaintiffs' argument that FDR is engaged "in part" in the business of prorating fails

Plaintiffs argue that, even if this Court determines that FDR does not have constructive control of its customer's funds, this Court should still find that FDR is operating as an unlicensed prorater on the grounds that FDR is engaged "in part" in the business of prorating. Plaintiffs reach this theory by way of a strained interpretation of California Financial Code section 12002.1. The section states that "[a] prorater is a person who, for compensation, engages in whole **or in part** in the business of receiving money or evidences thereof for the purpose of distributing the money or evidences thereof among creditors in payment or partial payment of the obligations of the debtor." Cal. Fin. Code § 12002.1 (emphasis added). Plaintiffs argue that this should be interpreted to mean that, even if this Court should find that FDR is not in constructive possession of its clients' funds, the Court could still find that FDR is a prorater based on its business relationships with Global and RMBT. Plaintiff argues that "[t]he sole purpose of the agreements between FDR and class members is to distribute money to creditors." On those grounds, plaintiffs claim that FDR is engaged in part of the prorating process because FDR solicits new customers and then directs those customers to Global's services.

Thus, plaintiffs read the words "in part" Section 12002.1 to define prorater as a company who is part of a prorating scheme, even if that party is never in constructive control of any money. A more reasonable interpretation of the words "in part" as used in the statute is that it applies to a company that directs only part of its resources to prorating, while also engaging in other forms of business. Therefore, whether a party is engaged in prorating "in whole or in part," the statute requires the business to be that of "receiving money." If this Court were to find, ultimately, that FDR is not in constructive possession

12

of its clients' funds, the fact that FDR directs new customers to Global's services would not by itself make FDR a prorater.

Plaintiffs' motion is DENIED.

## II. The Network defendants fail to demonstrate the non-involvement of the other named defendants

The Network defendants assert that, of the named defendants, FDR, or Freedom Debt Relief LLC, is the only one that offered debt settlement services during the class period. Thus, they argue, even if the prorater-based claims remain against FDR, the claims should at least be dismissed with regard to the other Network defendants. In support of this argument, the Network defendants present the declaration of Andrew Housser, the co-Chief Executive Officer of FDR, which states that, of the Network defendants, only FDR ever offered debt settlement services. Def. Mot. at 17.

In response, plaintiffs offer evidence indicating that the various defendant companies are merely "alter egos of each other." Pl. Opp. at 2, 15-17.[9]

The Network defendants correctly point out that common ownership, or a shared address alone, do not suffice to prove that one company is the alter-ego of another. However, plaintiffs do not need to prove that the companies are alter-egos at this stage; plaintiffs merely need to put forth evidence sufficient to defeat defendants' motion for summary judgment. While the evidence and allegations put forth by plaintiffs may not be dispositive, they are sufficient to defeat defendants' current motion. Therefore, the Network defendants' request for summary adjudication with respect to all Network

---

[9] *See also* Talley Decl. 2, Ex. 52 (organizational structure of defendants); Ex. 51 at FFN 049172 (showing that FDR is wholly owned by Freedom Financial Network, which was formerly owned by Alivio (not named in this action), and that FDR, Freedom Financial Network, and Alivio share the same managing members); *id.* at FFN 049175 ("Funds generated from FDR's operations are advanced to [Freedom Financial Network] and Alivio. The cumulative total of such advances was $48,449,808 as of December 31, 2009, including $19,152,688 of additions in 2009. Since the collection of these intercompany advances is not considered likely, they are treated as deemed distributions to affiliated entities."); *id.* at FFN 049195 ("[FDR] occupies space leased to its parent, [Freedom Financial Network]. There is no contractual arrangement for [FDR] to make lease payments under the leases."); Ex. 53 at 43:16-47:8 (statements from Staley, a Freedom Financial Network board member, to the effect that the companies have joint corporate meetings and are owned by the same individuals).

13

defendants other than FDR is DENIED.[10]

### III. The Network defendants fail to demonstrate that summary adjudication is appropriate on the individual factors of prorating

The Network defendants ask that this Court summarily adjudicate each aspect of the definition of prorating, with regard to each Network defendant, should this Court decline to summarily adjudge the entire question of whether FDR is a prorater. The aspects of prorating that the Network defendants ask this Court to determine are: (1) whether any of the Network defendants have received money from class members in order to then distribute that money to creditors; (2) whether any of the Network defendants have actual control over the class members' funds; (3) whether any of the Network defenders have constructive possession of the class members' funds; and (4) whether Global or RMBT have acted as agents for the Network defendants.

The question of whether FDR (or any of the other Network defendants) operates as a prorater already required the Court to look to the definition of one word of a narrow statute. It already required the Court to discuss each of the above, at least to some extent. The third question was, in fact, the focus of the Court's discussion. And the Court concluded that the evidence on the record does not prove the question of constructive possession one way or another.

The Court does not feel that the prorater question is further deconstructable, or that the evidence on the record is sufficiently one-sided for the Court to summarily adjudge the specific issues the Network defendants raise in this part of the motion. The Network defendants' alternative request is also DENIED.

///

---

[10] At the hearing, the Network defendants also argued that plaintiffs could not demonstrate that the Network defendants had acted as proraters with regard to the named plaintiffs. This argument was not raised in the briefs and therefore will not be decided at this time.

14

## CONCLUSION

For the foregoing reasons and for good cause shown, the Court hereby DENIES both plaintiffs' motion for summary judgment and defendants' motion for either summary judgment or summary adjudication of the issues. (Docs. 153, 158.)

**IT IS SO ORDERED.**

Dated: March 14, 2011

SUSAN ILLSTON
United States District Judge